Case: 1:26–mc–00130
Assigned To : Jackson, Amy Berman
Assign. Date : 9/14/2026
Description: Misc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE AMERICAN INDEPENDENT FOUNDATION,

Plaintiff,

v.

X CORP.,

Defendant.

Case No. _____

Underlying Litigation:
*X Corp. v. Media Matters for America*, No. 23 Civ. 1175 (N.D. Tex.)

ORAL ARGUMENT REQUESTED

**NOTICE OF MOTION TO QUASH X CORP.'S**
**<u>NONPARTY SUBPOENA OR FOR A PROTECTIVE ORDER</u>**

PLEASE TAKE NOTICE that the American Independent Foundation, through the undersigned counsel, and pursuant to Federal rule of Civil Procedure 45, hereby moves to quash the Subpoena Duces Tecum issued by X Corp. in connection with *X Corp. v. Media Matters for America*, No. 23 Civ. 1175 (N.D. Tex.), or in the alternative for a protective order to stay enforcement of the Subpoena pursuant to Federal rule of Civil Procedure 26. In support thereof, the American Independent Foundation submits the following Memorandum of Law, Declaration of Jackson Erpenbach and attached exhibits, and Declaration of Cathleen Warner. Upon such evidence and argument as may be presented at any hearing, on the date and time to be determined by the Court, the American Independent Foundation respectfully requests that the subpoena be quashed or that the Court issue a protective order.

RECEIVED
SEP 14 2026
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Dated: September 14, 2026
Washington, DC

Respectfully submitted,

Amy Jeffress, Bar No. 449258
Jackson Erpenbach, Bar No. 1735493
Rachel Freeh*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
rfreeh@heckerfink.com

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

*Attorneys for Nonparty The American Independent Foundation*

**pro hac vice applications forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE AMERICAN INDEPENDENT FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>X CORP.,<br><br>Defendant. | Case No. _____<br><br>Underlying Litigation:<br>*X Corp. v. Media Matters for America*, No. 23 Civ. 1175 (N.D. Tex.)<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE AMERICAN INDEPENDENT FOUNDATION'S MOTION TO QUASH**
**X CORP.'S NONPARTY SUBPOENA OR FOR A PROTECTIVE ORDER**

Amy Jeffress, Bar No. 449258
Jackson Erpenbach, Bar No. 1735493
Rachel Freeh*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
rfreeh@heckerfink.com

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

*Attorneys for Nonparty The American Independent Foundation*

**pro hac vice applications forthcoming*

## TABLE OF CONTENTS


Preliminary Statement ........ 1

Background ........ 2

- I. X Corp. Files a "Thermonuclear" Lawsuit Against the Nonprofit Media Matters for Articles It Published After Elon Musk's Acquisition of Twitter ........ 3
- II. Musk Encourages Harassment of Media Matters's Donors ........ 5
- III. The American Independent Publishes Stories about Elon Musk and DOGE ........ 6
- IV. The Fifth Circuit Stays X Corp.'s Discovery into Media Matters's Donors ........ 7
- V. X Corp. Instigates Retaliatory State and Federal Investigations of Media Matters Targeting Donor Identification ........ 9
- VI. X Corp. Serves Subpoenas on Media Matters's Donors and Fundraisers, Including the American Independent Foundation ........ 10

Legal Standard ........ 13

Argument ........ 15

- I. The Subpoena Should Be Quashed Because It Requires the Disclosure of Privileged Material that Is Irrelevant and Must Be Sought Elsewhere ........ 15
  - A. The American Independent Has Well-Recognized First Amendment Interests at Stake ........ 16
  - B. The American Independent Is Protected by the Reporter's Shield Law ........ 23
  - C. The Subpoena Seeks Information Irrelevant to the Texas Action ........ 24
  - D. X Corp. Can and Must Seek Information Elsewhere ........ 27
- II. The Subpoena Imposes an Undue Burden on the American Independent ........ 29
- III. In the Alternative, this Court Should Stay Enforcement of the Subpoena Pending the Fifth Circuit's Decision on X Corp.'s Similar Requests for Party Discovery ........ 32

Conclusion ........ 34

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*AF Holdings, LLC v. Does 1-1058*,
752 F.3d 990 (D.C. Cir. 2014) .......... 24, 29

*AFL-CIO v. Fed. Election Comm'n*,
333 F.3d 168 (D.C. Cir. 2003) .......... 13, 17

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .......... 16, 18, 19, 22

*Benham v. Rice*,
238 F.R.D. 15 (D.D.C. 2006) .......... 30

*Black Panther Party v. Smith*,
661 F.2d 1243 (D.C. Cir. 1981) .......... 15, 17

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 18

*Burlington Ins. Co. v. Okie Dokie, Inc.*,
368 F. Supp. 2d 83 (D.D.C. 2005) .......... 14

*Dart Indus. Co. v. Westwood Chem. Co.*,
649 F.2d 646 (9th Cir. 1980) .......... 33

*In re Denture Cream Prods. Liab. Litig.*,
292 F.R.D. 120 (D.D.C. 2013) .......... 14

*Diamond Servs. Mgmt. Co. v. Knobbe, Martens, Olson & Bear, LLP*,
339 F.R.D. 334 (D.D.C. 2021) .......... 14, 25

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 16, 18, 20, 22

*Gouse v. District of Columbia*,
359 F. Supp. 3d 51 (D.D.C. 2019) .......... 29

*Grunseth v. Marriott Corp.*,
868 F. Supp. 333 (D.D.C. 1994) .......... 23

*Int'l Action Ctr. v. United States*,
207 F.R.D. 1 (D.D.C. 2002) .......... 16, 27

*Int'l Union, UAW v. Nat'l Right to Work Found.*,
590 F.2d 1139 (D.C. Cir. 1978) .......... 17

*In re Kincaid*,
No. 22 Misc. 67, 2023 WL 6459801 (D.D.C. Oct. 4, 2023) .......... 16, 22

*In re Kincaid*,
No. 21 Misc. 67, 2023 WL 5933341 (D.D.C. Aug. 9, 2023) .......... 16, 24

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) .......... 33

*Linder v. Calero-Portocarrero*,
180 F.R.D. 168 (D.D.C. 1998) .......... 30

*Mannina v. O'Keefe Media Grp.*,
No. 25 Civ. 1524, 2026 WL 2186418 (D.D.C. July 29, 2026) .......... 23

*Media Matters for Am. v. Bailey*,
No. 24 Civ. 147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) .......... 9

*Media Matters for Am. v. FTC*,
No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .......... 10

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) .......... 10

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 10, 20

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024) .......... 9

*Media Matters for Am. v. X Corp.*,
No. 25 Civ. 2397, 2025 WL 1084715 (N.D. Cal. Apr. 10, 2025) .......... 5

*Media Matters for Am. v. X Corp.*,
No. 25 Civ. 2397, 2025 WL 1853770 (N.D. Cal. July 3, 2025) .......... 5

*In re Media Matters for Am.*,
No. 25-10630, 2026 WL 2453373 (5th Cir. Aug. 21, 2026) .......... 9

*Mehlhorn v. No Labels*,
No. 24 Misc. 101 (D.D.C. Dec. 23, 2024) .......... 22, 24, 28

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 18

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
641 F.3d 470 (10th Cir. 2011) ........ 23

*In re Musk*,
169 F.4th 445 (4th Cir. 2026) ........ 10

*N.C. Right to Life, Inc. v. Leake*,
231 F.R.D. 49 (D.D.C. 2005) ........ 14, 25, 28, 30, 31

*N.Y. State Nat'l Org. for Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989) ........ 15

*NAACP v. Alabama*,
357 U.S. 449 (1958) ........ 16

*In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*,
659 F. Supp. 3d 54 (D.D.C. 2023) ........ 14, 31

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) ........ 24

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ........ 23

*Phillips & Cohen, LLP v. Thorpe*,
300 F.R.D. 16 (D.D.C. 2013) ........ 14, 24, 28

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ........ 19

*Stone v. Trump*,
356 F. Supp. 3d 505 (D. Md. 2018) ........ 33

*In re Subpoena to Goldberg*,
693 F. Supp. 2d 81 (D.D.C. 2010) ........ 29

*In re Subpoena to Wang*,
214 F. Supp. 3d 91 (D.D.C. 2016) ........ 33

*In re Subpoenas Served on Am. Acad. of Pediatrics*,
No. 23 Misc. 4, 2023 WL 2351729 (D.D.C. Mar. 3, 2023) ........ 15

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 18

*Tripp v. Dep't of Def.*,
284 F. Supp. 2d 50 (D.D.C. 2003) .......... 16

*United States v. Int'l Bus. Machs. Corp.*,
83 F.R.D. 97 (S.D.N.Y. 1979) .......... 30

*US Dominion Inc. v. My Pillow Inc.*,
No. 21 Civ. 445, 2024 WL 2880425 (D.D.C. June 7, 2024) .......... 25

*Watts v. SEC*,
482 F.3d 501 (D.C. Cir. 2007) .......... 14, 33

*Whole Woman's Health v. Smith*,
896 F.3d 362 (5th Cir. 2018) .......... 23

*Wyoming v. U.S. Dep't of Agric.*,
208 F.R.D. 449 (D.D.C. 2002) .......... 27

*X Corp. v. Media Matters for Am.*,
No. 23 Civ. 1175, 2024 WL 4416887 (N.D. Tex. Sept. 27, 2024) .......... 8, 23

*X Corp. v. Media Matters for Am.*,
120 F.4th 190 (5th Cir. 2024) .......... 8, 9, 22, 30, 32

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .......... 15, 16, 20, 27

**STATUTES**

D.C. Code 16.4702 .......... 23

D.C. Code 16.4703(a) .......... 23, 24

Fed. R. Civ. P. 26 .......... 14, 24

Fed. R. Civ. P. 26(b)(1) .......... 8, 14

Fed. R. Civ. P. 26(c)(1) .......... 14, 33

Fed. R. Civ. P. 45 .......... 13, 14, 24

Fed. R. Civ. P. 45(d)(1) .......... 13

Fed. R. Civ. P. 45(d)(3) ........ 13

Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv) ........ 13

Fed. R. Civ. P. 45(d)(3)(A)(iv) ........ 29

**OTHER AUTHORITIES**

Accountable Tech, *#StopToxicTwitter Coalition Calls for Corporations to Stop Advertising Buys on Twitter, as Elon Musk's Layoffs Cut Content Moderation and Brand Safeguards* (Nov. 4, 2022), https://accountabletech.org/statements/stoptoxictwitter-coalition-calls-for-corporations-to-stop-advertising-buys-on-twitter-as-elon-musks-layoffs-cut-content-moderation-and-brand-safeguards/ ........ 3

Accountable Tech, *Open Letter to Twitter's Top 20 Advertisers* (Nov. 1, 2022), https://accountabletech.org/statements/open-letter-to-twitters-top-20-advertisers/ ........ 3

Barak Ravid, *Israel's Netanyahu Asks Elon Musk To Combat Antisemitism on X*, Axios (Sept. 18, 2023), https://www.axios.com/2023/09/18/elon-musk-netanyahu-israel-antisemitism-x ........ 3

Dan Milmo, *Elon Musk Threatens to Sue Anti-Defamation League over Lost X Revenue*, Guardian (Sept. 5, 2023), https://www.theguardian.com/technology/2023/sep/05/elon-musk-sue-adl-x-twitter ........ 3

Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, N.Y. Times (Oct. 27, 2022), https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html ........ 3

Kerry Breen, *100 Jewish Leaders Call Out Elon Musk for Antisemitism on X, Formerly Twitter: "We have Watched in Horror,"* CBS News (Sept. 26, 2023), https://www.cbsnews.com/news/elon-musk-antisemitism-on-x-twitter-jewish-leaders ........ 3

Oral Argument at 18:40, *X Corp. v. Media Matters*, No. 24-10900 (5th Cir. Feb. 18, 2025), https://www.ca5.uscourts.gov/oral-argument-recordings?docket=24-10900 ........ 25

The American Independent Foundation, Internal Revenue Code Form 990 (2023), https://apps.irs.gov/pub/epostcard/cor/331137541_202312_990_2025021023088144.pdf ........ 6

The American Independent Foundation, Internal Revenue Code Form 990 (2024), https://apps.irs.gov/pub/epostcard/cor/331137541_202412_990_2026020223884821.pdf ..................... 6

## PRELIMINARY STATEMENT

The American Independent Foundation (the "American Independent" or the "Foundation") is a 501(c)(3) nonprofit news organization that reports stories through its state-affiliate outlets that are published online and distributed across the country in print newspapers. The American Independent's mission is to make political news accessible to everyone, both by bringing print newspapers to rural areas and by explaining complex topics that affect readers' everyday lives. Its news coverage includes topics of local and national importance, ranging from gun safety to education to the economy. In recent years, among many other topics, the American Independent published stories about Elon Musk and the Department of Government Efficiency ("DOGE"), the controversial Executive Branch initiative that Musk previously oversaw.

The American Independent also awards grants to other nonprofit organizations that align with its mission. One prior recipient of grants from the American Independent is Media Matters for America ("Media Matters"), a separate 501(c)(3) nonprofit news organization that publishes investigative journalism from a progressive perspective. Over the course of 2022 and 2023, Media Matters published several articles critical of the changes that Elon Musk made to the social media platform Twitter (now "X") after he purchased the company. In response to Media Matters's publications, Musk directed X Corp. to file a "thermonuclear" lawsuit against Media Matters in the Northern District of Texas asserting state-law claims for disparagement and alleged interference with X Corp.'s advertising relationships. Musk directed the filing of similar lawsuits around the world and also instigated investigations by multiple state attorneys general and the Federal Trade Commission. Court after court—including several in this District—has concluded that this scorched-earth campaign constitutes retaliation against Media Matters for conduct plainly protected by the First Amendment.

In an expansion of this campaign, Musk and X Corp. have now trained their sights on yet more news organizations, and Media Matters's donors and supporters, including the American Independent. X Corp. first sought this information from Media Matters, but its efforts were put on hold by the Fifth Circuit. Undeterred, on August 10, 2026, X Corp. served a sweeping subpoena on the American Independent ("the Subpoena" or "the American Independent Subpoena") seeking detailed information about the DC-based American Independent's protected journalism, speech, and association with Media Matters and other like-minded organizations and individuals. These requests bear no relevance to the Texas-law claims X Corp. is pursuing against Media Matters.

This Court should quash the Subpoena in full for two primary reasons. First, the Subpoena infringes on the American Independent's First Amendment privilege not to disclose under threat of contempt its private speech and associational conduct, especially to a party with the expressed intent of weaponizing that information against it. Second, the Subpoena imposes an undue burden on the American Independent that is not proportionate to the relevance of, or X Corp.'s need for, the sensitive information requested. In the alternative, and at a minimum, the Court should issue a protective order staying enforcement of the Subpoena until the Fifth Circuit rules on X Corp.'s requests to obtain the information directly from Media Matters.

## BACKGROUND

The American Independent Subpoena is the latest in a long pattern of invasive and facially retaliatory conduct by Elon Musk and X Corp. in an explicit and years-long effort to bully and obstruct not only the nonprofit media organization Media Matters, but also any group or individual that ever chose to support Media Matters.

## I. X Corp. Files a "Thermonuclear" Lawsuit Against the Nonprofit Media Matters for Articles It Published After Elon Musk's Acquisition of Twitter

Musk first announced his intention to buy Twitter, Inc. (now, "X Corp.") in April 2022. The sale closed in October 2022.[1] Leading up to Musk's acquisition, and in the year following it, X Corp. faced criticism from multiple sources about a marked increase in antisemitic and pro-Nazi content on the platform, including criticism that Musk himself had endorsed antisemitic statements on the platform.[2] In the months after Musk's acquisition closed, for example, approximately 70 major nonprofits and advocacy organizations joined a coalition and jointly wrote an open letter to Twitter's advertisers urging them to pressure Musk to uphold brand safety standards.[3] Around this time, Media Matters, a 501(c)(3) nonprofit organization, published several articles that reported on changes in content on the platform. A November 16, 2023 article reported that "corporate advertisements" from companies including "Apple, Bravo, Oracle, Xfinity, and IBM" had "appear[ed] on pro-Hitler, Holocaust denial, white nationalist, pro-violence, and neo-Nazi accounts." Ex. 1.[4] The next day, Media Matters published another article showing advertisements

---

[1] Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, N.Y. Times (Oct. 27, 2022), https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

[2] *See, e.g.*, Kerry Breen, *100 Jewish Leaders Call Out Elon Musk for Antisemitism on X, Formerly Twitter: "We have Watched in Horror,"* CBS News (Sept. 26, 2023), https://www.cbsnews.com/news/elon-musk-antisemitism-on-x-twitter-jewish-leaders; Dan Milmo, *Elon Musk Threatens To Sue Anti-Defamation League over Lost X Revenue*, Guardian (Sept. 5, 2023), https://www.theguardian.com/technology/2023/sep/05/elon-musk-sue-adl-x-twitter; Barak Ravid, *Israel's Netanyahu Asks Elon Musk To Combat Antisemitism on X*, Axios (Sept. 18, 2023), https://www.axios.com/2023/09/18/elon-musk-netanyahu-israel-antisemitism-x.

[3] Accountable Tech, *#StopToxicTwitter Coalition Calls for Corporations to Stop Advertising Buys on Twitter, as Elon Musk's Layoffs Cut Content Moderation and Brand Safeguards* (Nov. 4, 2022), https://accountabletech.org/statements/stoptoxictwitter-coalition-calls-for-corporations-to-stop-advertising-buys-on-twitter-as-elon-musks-layoffs-cut-content-moderation-and-brand-safeguards/; Accountable Tech, *Open Letter to Twitter's Top 20 Advertisers* (Nov. 1, 2022), https://accountabletech.org/statements/open-letter-to-twitters-top-20-advertisers/.

[4] "Ex. __" refers to the exhibits attached to the Declaration of Jackson Erpenbach in Support of the American Independent Foundation's Motion to Quash X Corp.'s Nonparty Subpoena or for a Protective Order ("Erpenbach Decl.").

for companies including Amazon and NBCUniversal "next to content with white nationalist hashtags." Ex. 2.

In response to that reporting, Musk announced on X on November 18, 2023, that "X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company[.]" Ex. 3. Minutes later, Musk further promised action against "[Media Matters's] board, their donors, their network of dark money, all of them," Ex. 4, adding that "[t]he discovery and depositions will be glorious to behold," Ex. 5. On November 20, 2023, X Corp. made good on Musk's promise and filed a lawsuit against Media Matters and Eric Hananoki, the author of the November 16 and 17 articles. *X Corp. v. Media Matters for Am.*, No. 23 Civ. 1175 (N.D. Tex. Nov. 20, 2023), ECF 1 (the "Texas Action"). Although X Corp. is incorporated in Nevada and headquartered in California, and Media Matters is both incorporated and headquartered in Washington, DC, X Corp. filed its suit in the Northern District of Texas. In its operative complaint, X Corp. brings three tort claims under Texas law for tortious interference with contract, business disparagement, and interference with prospective economic advantage, all of which are premised on X Corp.'s allegation that Media Matters's articles published in November 2023 were factually inaccurate and were part of a "smear campaign" to "destroy X Corp.'s relationships with its advertising base." Ex. 6 ¶¶ 5-6, 65-88. X Corp. characterizes Media Matters's November 2023 articles as "the heart of" the Texas Action. *Id.* ¶ 23. In subsequent filings, X Corp. has demanded over $100 million in damages against Media Matters. *See, e.g.*, ECF 248-2 at 292, No. 23 Civ. 1175 (N.D. Tex. Oct. 7, 2025).

Media Matters continued to speak in the days following the Texas Action. In a November 26, 2023 interview, Media Matters's President and CEO, Angelo Carusone, stated that

X's "tools that they claimed were in place to protect brands were not operating" properly. Ex. 7. In response, X Corp. added him as a defendant in the Texas Action. Ex. 6.

Musk did not stop with the Texas Action. In response to one X user's post about the Texas Action, Musk responded that the lawsuit was "[t]he first of many." Ex. 8. And in subsequent months, X Corp.'s international subsidiaries pursued legal actions against Media Matters abroad, including: a lawsuit in Ireland on December 7, 2023; a cease-and-desist demand and a lawsuit in Singapore on December 7, 2023, and July 23, 2024, respectively; and a cease-and-desist demand on December 19, 2023, in the United Kingdom. *See* Compl. ¶¶ 71-72, 79, 87, *Media Matters for Am. v. X Corp.*, No. 25 Civ. 2397 (N.D. Cal. Mar. 10, 2025), ECF 1.

Media Matters filed an action in California to enjoin these international actions and enforce the exclusive forum-selection clause in X Corp.'s terms of service. *See id.* ¶¶ 123-44. The Northern District of California granted Media Matters's injunction, reasoning in part that "it seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights[.]" *Media Matters for Am. v. X Corp.*, No. 25 Civ. 2397, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025) (Chhabria, J.), *vacated and remanded on other grounds*, No. 25-2463, 2025 WL 3688854 (9th Cir. Dec. 19, 2025); *see also Media Matters for Am. v. X Corp.*, No. 25 Civ. 2397, 2025 WL 1853770, at *1 & n.1 (N.D. Cal. July 3, 2025) ("It appears that the real purpose of the foreign suits is to bully Media Matters.").

## II. Musk Encourages Harassment of Media Matters's Donors

Shortly after X Corp. filed the Texas Action, *The Washington Free Beacon* (an online newspaper "covering the enemies of freedom the way the mainstream media won't") published an article naming five individuals and foundations purported to be on Media Matters's "confidential donor list." Ex. 9. Following the article's publication, X users took to the platform to harass and

threaten those who were named, often with antisemitic statements such as: "Brace yourself for this shocking surprise — they're all 'jewish' Democratic megadonors," Ex. 10; "Lot of Jewish sounding names, sure it's just a cohencidence," Ex. 11; and "Self-destructing Jews. More modern conveniences…" Ex. 12. Others called explicitly for violence or harsh punishment: "It's time for trials for treason and crimes against humanity. I want to see the death penalty served on all of them," Ex. 13, and "Tribunals in GITMO to save America!" Ex. 14. Musk amped up the rhetoric, resharing a post about *The Washington Free Beacon* article and promising to "add them as defendants in the lawsuit." Ex. 15. One user responded to Musk's post with a picture of Musk aiming a rifle at Media Matters's logo. Ex. 16. As the Texas Action has continued, Musk has asserted that Media Matters is "pure evil," Ex. 17, and "evil incarnate," Ex. 18.

The American Independent Foundation's prior financial support of Media Matters is public information. The organization's 2023 and 2024 Form 990s indicate that it awarded an $810,500 grant and a $1 million grant to Media Matters in 2023 and 2024, respectively.[5]

## III. The American Independent Publishes Stories about Elon Musk and DOGE

As part of its comprehensive news coverage, the American Independent and its state affiliates report on national political figures and the actions of the federal government. As one aspect of that coverage, leading up to the 2024 election and continuing into the second Trump Administration, the American Independent wrote stories about Elon Musk, one of President Trump's largest donors and a high-level advisor in the Administration, as well as DOGE, the Executive Branch initiative that Musk proposed and then oversaw. In November 2024, for instance, an American Independent article reported on President Trump's decision to name Musk

[5] The American Independent Foundation, Internal Revenue Code Form 990 (2023), https://apps.irs.gov/pub/epostcard/cor/331137541_202312_990_2025021023088144.pdf; The American Independent Foundation, Internal Revenue Code Form 990 (2024), https://apps.irs.gov/pub/epostcard/cor/331137541_202412_990_2026020223884821.pdf.

as the co-leader of the new government efficiency department, reporting that Musk "has no experience working in the government," "has touted debunked conspiracy theories, including that Jews are stoking anti-white hatred," and that he "censored journalists and critics and amplified right-wing misinformation" after purchasing Twitter, causing the company to lose nearly three quarters of its value since the purchase. Exs. 19-21. In December 2024, the American Independent reported that Musk and his company SpaceX had been sued by former employees who "claimed they were improperly fired for coming forward with allegations of sexual harassment and discrimination at the company." Exs. 22-24. The next year, the American Independent and its state affiliates published several articles about the actions of DOGE. In April 2025, for example, the Virginia Independent reported that hiring freezes and staff reductions implemented by DOGE were leaving Virginian veterans unemployed. Ex. 25. In recent years, the American Independent has limited its reporting about Musk, and the existence of the Subpoena could further chill any such reporting. *See* Declaration of Cathleen Warner in Support of the American Independent Foundation's Motion to Quash X Corp.'s Nonparty Subpoena or for a Protective Order ("Warner Decl.") ¶ 24.

## IV. The Fifth Circuit Stays X Corp.'s Discovery into Media Matters's Donors

Following the purported leak of Media Matters's donors, and consistent with Musk's repeated promises to go after Media Matters's funding, X Corp. demanded in the Texas Action that Media Matters produce a broad swath of information about its donors, including (but not limited to) the following:

> **Request for Production 17.** Documents sufficient to show the identity of all Your donors or any others who provide financial support of any kind, their residence, the time and place of their donation or provision of financial support, and the amount of their donations or other financial support.
>
> **Request for Production 18.** Any document or communication reflecting Your attempts to solicit donations or financial support of any kind, including but not limited to any

> discussions with donors or any others who provided, considered providing, or were asked to provide financial support of any kind.
>
> **Request for Production 21**. All documents and communications regarding Your sources of funding for research, investigation, reporting, publication, or any other work related to X, the Platform, Elon Musk, or Linda Yaccarino.
>
> **Request for Production 35**. All materials regarding or communications with any donor or potential donor to Media Matters mentioning or regarding in any way this Matter, Elon Musk, Linda Yaccarino, X, Twitter, or the Platform, including misinformation, brand safety, or ad pairing on the Platform.

*X Corp. v. Media Matters for Am.*, 120 F.4th 190, 194 (5th Cir. 2024); *see also* Appendix at 13, 24, No. 23 Civ. 1175 (N.D. Tex. Aug. 30, 2024), ECF 85 (requests served February 5 and March 29, 2024, respectively).

Chief Judge Reed O'Connor granted X Corp.'s motion to compel, rejecting X Corp.'s argument that the First Amendment categorically did not apply to discovery between private parties, but concluding that Media Matters had waived its First Amendment privilege over private donor information. *X Corp. v. Media Matters for Am.*, No. 23 Civ. 1175, 2024 WL 4416887, at *7, *9 (N.D. Tex. Sept. 27, 2024).

Media Matters filed an interlocutory appeal and sought a stay of the discovery order pending appeal. The Fifth Circuit granted a stay, holding that even if Media Matters waived the First Amendment privilege, X Corp.'s discovery requests still exceeded the bounds of party discovery under Federal Rule of Civil Procedure 26(b)(1) because the information sought about Media Matters's donors was not "proportional to the needs of the case." *X Corp.*, 120 F.4th at 198. While the information was of little or no relevance or utility to X Corp., "Media Matters and its donors would bear a heavy burden if Media Matters had to release this information" because "[i]t could enable others to harass or intimidate Media Matters or its donors." *Id.* at 199. The court highlighted one of Musk's many statements about Media Matters's donors, stating that "X Corp.

would 'pursue not just [Media Matters] but anyone funding that organization. I want to be clear about that anyone funding that organization, will be, we will pursue them.'" *Id.*

The Fifth Circuit is also addressing venue issues in a parallel proceeding, and just recently, on August 21, 2026, vacated the Northern District of Texas's denial of Media Matters's motion to transfer the Texas Action to California, holding that the court's analysis was erroneous. *In re Media Matters for Am.*, No. 25-10630, 2026 WL 2453373, at *6 (5th Cir. Aug. 21, 2026). Media Matters's appeal of the discovery order on the merits is being held in abeyance until the venue issues are resolved and remains pending in the Fifth Circuit.[6]

## V. X Corp. Instigates Retaliatory State and Federal Investigations of Media Matters Targeting Donor Identification

As the Fifth Circuit put the brakes on X Corp.'s efforts to identify Media Matters's donors through discovery in the Texas Action, the public attacks on Media Matters by Musk—the world's richest person and a prominent political donor—caused the Attorneys General of Texas and Missouri to issue civil investigative demands ("CIDs") to Media Matters that sought, among other things, the identity of all its donors, all communications with those donors, and internal communications and strategizing. *See Media Matters for Am. v. Bailey*, No. 24 Civ. 147, 2024 WL 3924573, at *2-3 (D.D.C. Aug. 23, 2024) (Mehta, J.); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 9-11 (D.D.C. 2024) (Mehta, J.), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025). The court in each case concluded that the CIDs were likely retaliation for Media Matters's First Amendment–protected speech about Musk and X Corp. and enjoined the CIDs. *Bailey*, 2024 WL 3924573, at *10-19; *Paxton*, 732 F. Supp. 3d at 27-30. In a unanimous decision, the D.C. Circuit agreed,

[6] *In re Media Matters for Am.*, No. 25-10630 (5th Cir. Aug. 21, 2026), ECF 93-1 ("Media Matters' interlocutory appeal [of the discovery order] remains HELD IN ABEYANCE until any new mandamus petition is resolved [in Case No. 25-10630]"); *X Corp. v. Media Matters for Am.*, No. 24-10900 (5th Cir. Aug. 27, 2026), ECF 153.

concluding that Media Matters's reporting was "obviously . . . protected under the First Amendment" and that Attorneys General Bailey and Paxton began their investigations in direct response to Musk's statements to retaliate against Media Matters for its protected conduct. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 571-72, 584-85 (D.C. Cir. 2025).

Later, in May 2025, while Musk held a high-level position in the Executive Branch, *e.g.*, *In re Musk*, 169 F.4th 445, 447 (4th Cir. 2026), the Federal Trade Commission issued a CID to Media Matters containing a similar set of requests to what X Corp. and the state attorneys general had served, *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 116-17 (D.D.C. 2025) (Sooknanan, J.). Again, a court in this District held that the CID was unlawful retaliation, stemming from Musk's public statements on X, and enjoined the CID's enforcement. *Id.* at 134-38. And, again, the D.C. Circuit agreed, holding that the CID's "sweeping demand" for information about, and communications with, donors was likely issued in retaliation for Media Matters's protected reporting about X. *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *6-9 (D.C. Cir. Oct. 23, 2025) (per curiam).

### VI. X Corp. Serves Subpoenas on Media Matters's Donors and Fundraisers, Including the American Independent Foundation

This motion arises from the latest tactic Musk and X Corp. are trying to obtain the same donor-related information. This time around, X Corp. has issued a slew of nonparty subpoenas directly to donors, fundraisers, and supporters linked to Media Matters. On August 10, 2026, X Corp. served the Subpoena on the American Independent Foundation. *See* Erpenbach Decl. ¶ 28; Ex. 26.

The American Independent is a nonprofit news organization focused on publishing accessible investigative journalism. It reports on stories of local and national interest through state affiliates across the country. Warner Decl. ¶¶ 4-5. These stories are published online and

distributed in print locally. *Id.* ¶ 4. The American Independent employs a team of reporters and editors, some of whom focus on specific states, as well as other professional staff. *Id.* ¶ 6.

The American Independent both receives donations and awards grants to other nonprofit organizations that are consistent with its mission. *Id.* ¶¶ 7, 10. Media Matters is a prior recipient of the American Independent's grants, as disclosed in the Foundation's Form 990. *Id.* ¶ 11. The American Independent also solicits and receives donations from both individuals and organizations, which are not disclosed publicly. *Id.* ¶¶ 7-9.

The American Independent Foundation has no editorial control over Media Matters's journalism or the topics or campaigns that Media Matters's reporters will cover. *Id.* ¶ 12. Neither the American Independent, nor any member of its editorial team, drafted, edited, or otherwise revised Media Matters's November 2023 articles about X, nor has the American Independent ever drafted or edited an article posted on the Media Matters website. *Id.* ¶¶ 12-13.

The American Independent Subpoena includes six requests for documents and information that seek broad swaths of information about the American Independent's publications and relationships with Media Matters and other third-party organizations, often unrelated to X Corp.'s claims in the Texas Action:

> **REQUEST FOR PRODUCTION NO. 1:** All documents concerning (a) X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising.
>
> **REQUEST FOR PRODUCTION NO. 2:** All documents concerning (a) boycotting the Platform, (b) outreach or communications targeted at X's advertisers (or potential advertisers) regarding the Platform, (c) coordinating or participating in any public pressure campaign relating to content moderation on the Platform or aimed at reducing or discouraging advertising on the Platform, or (d) the goals, objectives, strategies, or plans of Media Matters, Media Matters Action Network, or the Bonner Group, concerning any of the matters described in subparagraphs (a) through (c) above.
>
> **REQUEST FOR PRODUCTION NO. 3:** All documents concerning any request, requirement, or condition (whether formal or informal) that obligates or encourages

> Media Matters to organize, conduct, or participate in: (a) efforts to boycott the Platform or to encourage others, including its advertisers to do so, (b) public pressure campaigns relating to content moderation, ad adjacencies, brand safety, or advertising on the Platform, or (c) efforts aimed at reducing or discouraging advertising on the Platform. This includes any such requests or conditions contained in grant agreements, donation agreements, funding proposals, or similar instruments.
>
> **REQUEST FOR PRODUCTION NO. 4:** Documents sufficient to show any trainings, videos, conferences, or webinars hosted or circulated by Media Matters, Media Matters Action Network, Unbendable Media LLC, or The Bonner Group concerning (a) X, (b) Elon Musk, (c) the Articles, (d) the Matter, or (e) misinformation, content moderation, ad adjacencies, brand safety, or advertising on the Platform.
>
> **REQUEST FOR PRODUCTION NO. 5:** All documents from Media Matters, Media Matters Action Network, or The Bonner Group soliciting donations or grants relating to (a) content moderation, (b) reducing or discouraging advertising on the Platform, or (c) otherwise concerning X, Elon Musk, the Articles, the Matter, or misinformation, ad adjacencies, brand safety, or advertising on the Platform.
>
> **REQUEST FOR PRODUCTION NO. 6:** All documents concerning Advocacy Campaigns and Your efforts to aid, participate in, or otherwise support Advocacy Campaigns.

The American Independent Subpoena does not define many of the key terms used in its requests, including "public pressure campaign," "misinformation," or "content moderation," and defines other terms in exceedingly broad terms, such as "Advocacy Campaigns" as "any organization, coalition, or other initiative" (including its "agents," "volunteers," or "persons . . . purporting to act on [its] behalf") "with an objective or goal to influence the conduct, policies, decisions, or profitability of X." Ex. 26 at 10. It does not include a date range limitation on any request, nor does it exclude from the requests information that X Corp. has already obtained from Media Matters or that X Corp. has been expressly denied in the Texas Action.

The Subpoena set a response deadline of August 24, 2026. Ex. 26 at 4. On August 24, 2026, counsel for X Corp. agreed to extend the American Independent's deadline to respond to the Subpoena to September 14, and subsequently to September 18. Erpenbach Decl. ¶¶ 29-30. Counsel for the American Independent offered to meet and confer with counsel for X Corp., proposing that

X Corp. withdraw its Subpoena until the Fifth Circuit had ruled on X Corp.'s party discovery into Media Matters's donors and then consider a tailored subpoena, proportional to the needs of the case, and consistent with the American Independent's First Amendment rights. *Id.* ¶ 29. Counsel for X Corp. stated that they were unwilling to meet and confer prior to the American Independent's September 18 response date. *Id.* ¶ 30. The American Independent therefore files (before that response date) this motion to quash the Subpoena to protect its First Amendment rights and its right as a nonparty to be free from unduly burdensome subpoenas.

## LEGAL STANDARD

Under Rule 45, a nonparty may file a motion to quash a subpoena in "the district where compliance is required." Fed. R. Civ. P. 45(d)(3). The court is "[r]equired" to quash the subpoena if it "requires disclosure of privileged or other protected matter" or if the subpoena "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv); *see also* Fed. R. Civ. P. 45(d)(1) (imposing a "duty" on the court and the subpoenaing party to ensure a subpoena does not "impos[e] undue burden or expense on a person subject to the subpoena").

Courts have "long recognized" a First Amendment privilege against disclosure of political affiliations and activities when such disclosure threatens to chill speech or otherwise impose a substantial burden on First Amendment rights. *See AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 175-76 (D.C. Cir. 2003).

To determine if a subpoena imposes an undue burden, courts consider several factors, including (1) "whether the discovery is unreasonably cumulative or duplicative"; (2) "whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive"; and (3) "whether the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed

discovery in resolving the issues." *Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 18 (D.D.C. 2013) (quoting *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013)).

Rule 45 also incorporates the limits on civil discovery in Rule 26, *Diamond Servs. Mgmt. Co. v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 338 (D.D.C. 2021), which requires that all discovery must be "relevant to a[] party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1). Although relevance is a broad standard, it excludes "information with no conceivable bearing on the case." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F. Supp. 2d 83, 86 (D.D.C. 2005) (internal quotations omitted). And courts assess the proportionality requirement in light of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

In applying the limits of discovery to a nonparty subpoena, Rule 45 requires that courts be sensitive to the subpoena recipient's nonparty status. *N.C. Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005); *see Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (Kavanaugh, J.) ("The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties."). Accordingly, a court may quash a subpoena under Rule 45 even if the subpoena seeks information with some relevance to the underlying action. *See In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d 54, 58-61 (D.D.C. 2023).

Based on similar considerations, a court may also issue a protective order, including to stay discovery, in lieu of quashing a nonparty subpoena. *See* Fed. R. Civ. P. 26(c)(1).

## ARGUMENT

### I. The Subpoena Should Be Quashed Because It Requires the Disclosure of Privileged Material that Is Irrelevant and Must Be Sought Elsewhere

The Court should quash the Subpoena because it demands disclosure of information and communications protected by the American Independent's First Amendment freedom to associate with like-minded organizations and individuals, and it seeks information regarding First Amendment–protected newsgathering. X Corp. cannot make a showing of need sufficient to overcome the American Independent's First Amendment privilege.

Courts in this District consider a motion to quash a subpoena based on the First Amendment privilege using a two-step burden-shifting framework that balances the subpoena recipient's First Amendment rights against the demonstrated interest of the party seeking disclosure. *See In re Subpoenas Served on Am. Acad. of Pediatrics*, No. 23 Misc. 4, 2023 WL 2351729, at *1 (D.D.C. Mar. 3, 2023). First, the party asserting the First Amendment privilege must make a *prima facie* showing that enforcement of the subpoena infringes upon a First Amendment interest. To do so, the nonparty "need not prove to a certainty that its First Amendment Rights will be chilled by disclosure[,] . . . only . . . some probability that disclosure will lead to reprisal or harassment." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981), *cert. granted and vacated on other grounds*, 458 U.S. 1118 (1982); *see also N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989) ("Mindful of the crucial place speech and associational rights occupy under our constitution, we hasten to add that in making out a *prima facie* case of harm the burden is light."). Where confidential newsgathering material is sought, this first hurdle is overcome, since "[c]ompelling a reporter to disclose the identity of a confidential source raises obvious First Amendment problems." *Zerilli v. Smith*, 656 F.2d 705, 710 (D.C. Cir. 1981).

If that *prima facie* case is made, the burden shifts to the subpoenaing party to demonstrate both that (a) "the requested information goes to the heart of the lawsuit" and is "crucial to the party's case," *In re Kincaid*, No. 21 Misc. 67, 2023 WL 5933341, at *5, *7 (D.D.C. Aug. 9, 2023) (internal quotations omitted), *R&R adopted*, 2023 WL 6459801 (D.D.C. Oct. 4, 2023); and, further, (b) the subpoenaing party "has exhausted every reasonable alternative source of information," *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3-4 (D.D.C. 2002) (quotation omitted). This Circuit applies this same framework to protect reporters' "compelled disclosure of sources and information obtained through news gathering activities." *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 54 (D.D.C. 2003). In cases where the reporter is a nonparty, that privilege should prevail "in all but the most exceptional cases." *Zerilli*, 656 F.2d at 712; *see also id.* at 714-15.

Because the Subpoena cannot withstand application of this doctrinal framework, the Court should quash it in full.

### A. The American Independent Has Well-Recognized First Amendment Interests at Stake

The American Independent has several distinct and well-established First Amendment interests at stake. As the Supreme Court recently reiterated, the First Amendment protects the right to associate with others, which includes the right to "privacy in one's associations." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1123 (2026) (quoting *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)). As is relevant here, demands for donor information impose "a widespread burden on donors' associational rights." *Americans for Prosperity Found. v. Bonta ("AFP")*, 594 U.S. 595, 618 (2021). Separately, the First Amendment also guards the "importance of a vigorous press" by protecting reporters' sources and other materials obtained during the newsgathering process. *Zerilli*, 656 F.2d at 712; *see Tripp*, 284 F. Supp. 2d at 54.

*First*, to protect the right to associate, the D.C. Circuit has long recognized a First Amendment privilege against the disclosure of affiliations, internal communications, strategies, and organizing when such disclosure threatens retaliation or to chill protected First Amendment activity. *See, e.g.*, *AFL-CIO*, 333 F.3d at 177-78; *Black Panther Party*, 661 F.2d at 1265-66; *Int'l Union, UAW v. Nat'l Right to Work Found.*, 590 F.2d 1139, 1147-48 (D.C. Cir. 1978).

The Subpoena tramples these well-established principles, seeking to compel the American Independent to disclose its private associations with like-minded organizations, donors, and individuals. Requests 2 to 5, for example, seek categories of documents relevant to nearly every aspect of the American Independent's relationship with Media Matters, including but not limited to its donations or funding arrangements, trainings and events attended, and correspondence regarding Media Matters's objectives or strategies. Ex. 26 at 14. And Requests 2, 3, 4, 5, and 6 explicitly seek information regarding the American Independent's relationship with third parties, namely The Bonner Group (Requests 2, 4, 5), Unbendable Media LLC (Request 4), and "any organization . . . with an objective or goal to influence the conduct, policies, decisions, or profitability of X or the Platform" (Request 6; definition of "Advocacy Campaigns"), as well as the American Independent's involvement in associational activity including "boycotting" or "public pressure campaigns" (Requests 2, 3). The broad language of Request 1 further sweeps in materials related to any number of unnamed organizations, including by requesting information relevant to X and Elon Musk, as well as "misinformation, content moderation, ad adjacencies, brand safety, or advertising." Ex. 26 at 14.

Documents responsive to these requests could include detailed information about the American Independent's relationship with Media Matters, the Bonner Group, Unbendable Media LLC, and any other number of unidentified organizations or individuals implicated by the broad

language of the Subpoena. For example, correspondence with donors, sources, and other reporters relevant to the American Independent's articles and touching on one of the broad topics enumerated in Request 1 may fall within the scope of these requests. The production of such documents could expose the duration, purpose, and extent of the American Independent's relationship with any of these organizations or individuals.

The Subpoena also infringes on the American Independent's First Amendment rights by seeking documents relevant to the American Independent's internal strategy discussions, and any discussions with like-minded organizations regarding newsgathering or reporting strategy. By seeking "[a]ll documents concerning . . . misinformation, content moderation, ad adjacencies, brand safety, and advertising," for instance, Request 1 could sweep in any number of internal staff communications regarding the American Independent's inner workings. *See e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024); *TikTok Inc. v. Garland*, 604 U.S. 56, 68-69 (2025) (per curiam). The Subpoena would likewise sweep in broader policy-based discussions with other organizations on topics of ongoing political and public debate that are especially relevant to a news organization. *See* Warner Decl. ¶¶ 18-22.

*Second*, and relatedly, the Subpoena threatens to expose information about the American Independent's donations and its donors. But the Supreme Court has repeatedly recognized a First Amendment interest in protecting donor information, explaining that "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" *First Choice*, 146 S. Ct. at 1123 (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (per curiam)); *AFP*, 594 U.S. at 618 (demands to disclose private donor information "impose[] a widespread burden on donors' associational rights"); *Buckley*, 424 U.S. at 66 ("[T]he invasion of

privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations . . . .").

This right squarely protects not only donations made by the American Independent, but also its interest in protecting the identity of its donors and in effectively soliciting charitable donations. *See AFP*, 594 U.S. at 617-18; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789-90, 794 (1988) (explaining that "the solicitation of charitable contributions is protected speech," including when solicitation is conducted by "professional fundraisers"); *id.* at 803 (Scalia, J., concurring in part and concurring in the judgment) ("We have held the solicitation of money by charities to be fully protected as the dissemination of ideas."). And as the Supreme Court has squarely addressed, because each new disclosure "brings with it an additional risk of chill," the requests infringe on the American Independent's First Amendment rights even though some of the American Independent's donation information was previously made public. *AFP*, 594 U.S. at 617-18 (rejecting argument that disclosure was permissible because "that donor information is already disclosed to the IRS as a condition of federal tax-exempt status.").

The language of the Subpoena makes its intent to target donor information clear. Requests 3 and 5 explicitly seek information related to donations or funding, demanding, for example, information "contained in grant agreements, donation agreements, funding proposals, or similar instruments" and documents "soliciting donations or grants" related to a series of broad topics. Ex. 26 at 14. In addition to these two requests, each of the other four requests is broad enough to cover similar materials relevant to donations. Request 4, for instance, seeks trainings, videos, and webinars, which would presumably include any such presentations made to potential donors. *Id.* And Request 2 seeks all documents concerning "the goals, objectives, strategies, or plans" of Media Matters related to topics including boycotting X and "coordinating or participating in a

public pressure campaign," which would include any fundraising or donative documents tied to these objectives. *Id.* Request 1, which broadly covers a series of topics without any connection to Media Matters, would cover any communications with potential donors relevant to these topics.

These requests plainly infringe on the American Independent's First Amendment right to maintain the privacy of donation information—both its donations made and those received—particularly where the information is sought by a party that has promised publicly to use that information to attack donors. *See First Choice*, 146 S. Ct. at 1124-25.

*Third*, the Subpoena infringes on the American Independent's First Amendment right as a news organization against the compelled disclosure of confidential newsgathering materials, including confidential sources. As discussed above, the Subpoena requests broad swaths of information relevant to topics of ongoing public interest: misinformation, X Corp., Musk, brand safety, and more. Ex. 26 at 14. These topics are self-evidently newsworthy. Indeed, the American Independent has previously reported on exactly these topics. *See supra* at 6-7. And because the American Independent is a news organization, it maintains correspondence relevant to its newsgathering efforts, including communications with sources. Warner Decl. ¶¶ 17-19, 23. Forcing the American Independent to disclose this information, particularly as a nonparty, would "significantly interfere with [its] news gathering ability" and so harm the American Independent's First Amendment interests. *Zerilli*, 656 F.2d at 711; *Media Matters for Am.*, 138 F.4th at 580 ("'[B]ad faith use of investigative techniques can abridge journalists' First Amendment rights.").

* * *

With respect to all of these infringements, the risk of retaliation, harassment, and resulting chill to First Amendment activity cannot be overstated. In this extraordinary case, retaliation is not just the byproduct, but the express purpose of X Corp.'s discovery tactics against the American

Independent and other nonparties. That much is clear from Musk's own statements that he and X Corp. will go after Media Matters's "donors" and "network" of funding, will "pursue" those donors, and will "add [donors] as defendants in the lawsuit." *Supra* at 4-6. Other forms of retaliation have already been suffered: After only a few donors' information was purportedly leaked publicly, those individuals and organizations faced a slew of online harassment that indulged in hateful antisemitic remarks and threatened violence. *Supra* at 5-6. And rather than turn down the temperature, Musk has only further stoked the fires by periodically telling his (hundreds of millions of) online followers that Media Matters and its partners are "pure evil," Ex. 17, and "evil incarnate," Ex. 18. Moreover, as noted, courts in this Circuit—collectively reflecting the views of seven federal judges—have further held that Musk's public attacks on Media Matters led to a series of retaliatory investigations against Media Matters to punish it for protected First Amendment speech. *Supra* at 9-10.

It is clear, especially in this context, that the American Independent Subpoena threatens to chill protected First Amendment conduct. Musk's campaign against Media Matters has already chilled the American Independent's grant-making activity and its willingness to otherwise associate with Media Matters, the individual defendants, and other like-minded organizations. Warner Decl. ¶ 24. The Texas Action has also chilled the American Independent's free-speech rights in the content that it publishes. *Id.* Because of the breadth of the Subpoena, if enforced, it could require the production of correspondence between the American Independent and donors or organizations relevant to the issues covered in the Subpoena. *Id.* ¶¶ 15-16, 22. It could also require the production of confidential source information. *Id.* ¶¶ 17-19, 23. If the American Independent is compelled to produce such communications, the chilling effect will only cascade, affecting other

organizations, donors, or sources, for fear that their associations too will be disclosed publicly to Musk or others. *Id.* ¶¶ 23-24, 26.

This risk of retaliation and chill would not be ameliorated even if X Corp. promised to keep the American Independent's responses confidential (a promise that the Subpoena does not make). As the Fifth Circuit recognized, Chief Judge O'Connor has refused to issue a protective order in the Texas Action, heightening the risk that X Corp. will share the American Independent's confidential information freely to carry out exactly the retaliatory conduct that it has promised publicly to do. *See X Corp.*, 120 F.4th at 199. Even if such an enforceable order were in place, it still would be insufficient. The Supreme Court has held repeatedly that requests for disclosure of private information chill First Amendment conduct even if public dissemination of the information is prohibited. *See, e.g.*, *First Choice*, 146 S. Ct. at 1130-31; *AFP*, 594 U.S. at 615-17. The same result is true here, where disclosure would be made directly to Musk's X Corp., a political opponent of the associational activity at issue.

Last, X Corp. may argue, as it has in the Texas Action, that the First Amendment has no application to a discovery demand by a private party. That position is grievously mistaken. X Corp. seeks to invoke the coercive power of the state to enforce its demands for privileged information, and its request thus necessarily implicates the First Amendment. Accordingly, courts in this Circuit have consistently held that the First Amendment privilege applies equally to discovery demands by private parties as it does to compelled disclosure to the government. *See, e.g.*, *In re Kincaid*, No. 22 Misc. 67, 2023 WL 6459801, at *4-5 (D.D.C. Oct. 4, 2023) (applying First Amendment privilege to nonparty subpoena issued by private nonprofit to law firm); Memorandum Opinion & Order at 23-30 ("Mehlhorn Opinion"), *Mehlhorn v. No Labels*, No. 24 Misc. 101 (D.D.C. Dec. 23, 2024), ECF 20-1 (quashing in large part subpoena issued by private political party to opposing

political organizer based on First Amendment privilege). Chief Judge O'Connor also rejected the argument in the Texas Action. *See X Corp.*, 2024 WL 4416887, at *9. And so has every circuit to have considered the issue. *See, e.g.*, *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 481 (10th Cir. 2011) ("[T]he First Amendment privilege applies to discovery orders issued in litigation involving only private parties."); *Perry v. Schwarzenegger,* 591 F.3d 1147, 1160-65 (9th Cir. 2010) (ordering district court to issue a protective order against private plaintiff's discovery requests on basis of First Amendment); *Whole Woman's Health v. Smith*, 896 F.3d 362, 369-70, 372-74 (5th Cir. 2018) (applying First Amendment protection to private plaintiff's discovery request to private, religious nonprofit).

For these reasons, the American Independent has met its burden to make a *prima facie* showing that the Subpoena infringes upon its privileged First Amendment interests.

**B. The American Independent Is Protected by the Reporter's Shield Law**

In addition to infringing the American Independent's First Amendment rights, the Subpoena also runs afoul of the District of Columbia's reporter's shield law, which "protect[s] newsgathering activities of reporters." *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). Under the statute, a subpoena may not compel a reporter or media organization to disclose the source of any news information or "[a]ny news or information" or "[o]ther data" "procured . . . in the course of pursuing professional [news media] activities." D.C. Code § 16-4702. The protection of news sources is "absolute," *Mannina v. O'Keefe Media Grp.*, No. 25 Civ. 1524, 2026 WL 2186418, at *6 (D.D.C. July 29, 2026), and the protection of other newsgathering information can be overcome only with "clear and convincing evidence" that the information sought is "relevant to a significant legal issue," that the information cannot "be obtained by any alternative means," and there is an "overriding public interest in the disclosure," D.C. Code § 16-4703(a).

The Subpoena cannot overcome the shield law for the same reasons that it is incompatible with the protections of the First Amendment. From top to bottom, the Subpoena demands documents and communications that implicate the American Independent's sources and information procured by its journalists' newsgathering, seeking any and all documents and communications "concerning" X, Musk, misinformation, and more. *See supra* at 17-20. Nor, for the reasons below, can X Corp. demonstrate that any of this information is relevant to the Texas Action (let alone to a "significant legal issue") nor any other requirements of the statute, and certainly not by "clear and convincing evidence." D.C. Code § 16-4703(a).

### C. The Subpoena Seeks Information Irrelevant to the Texas Action

Because the American Independent has made a *prima facie* showing of First Amendment harm, the burden shifts to X Corp., which cannot make the necessary showing to enforce its slew of broad requests. To start, the Subpoena does not seek information relevant to the claims or defenses in the Texas Action, let alone information at the "heart of" or "crucial to" the case. *In re Kincaid*, 2023 WL 5933341, at *5, *7.

The straightforward reason for X Corp. seeking this information from the American Independent is that Musk and X Corp. want to harass, and then maybe try to sue, the American Independent and its donors. *See supra* at 3-6. But it is black-letter law in this Circuit that such a "naked attempt to gather information for use in evaluating, and perhaps litigating, a claim against" a subpoena recipient is improper under Rules 26 and 45. *Phillips & Cohen, LLP*, 300 F.R.D. at 18; *see also, e.g., AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995-96 (D.C. Cir. 2014) ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied." (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978))); Mehlhorn Opinion at 22 (quashing subpoena where subpoenaed party

"raise[d] valid concerns that the information [the subpoena] seeks is not for use in the [underlying litigation] as it currently exists but for some future additional litigation").

Perhaps trying to back away from their client's admitted purpose, counsel for X Corp. offered an alternative explanation for discovery into private donor information at the Fifth Circuit, where they speculated that "[i]f there was a great deal of donors or great deal of dollars from donors who happen to have an axe to grind with X or . . . Elon Musk or Twitter or anything else relevant in the case, that would go a long way to being able to show to a jury a reason for why Media Matters lied."[7] This theory of relevance is admittedly a "fishing expedition" based on speculation about the Foundation's prior grants and what it may have communicated to Media Matters about—all speculation that cannot justify discovery from a nonparty. *Diamond Servs. Mgmt. Co.*, 339 F.R.D. at 340.

Even if X Corp.'s unsupported hypothesis were later proven correct, the information would still be irrelevant because the only motives relevant to any of X Corp.'s claims are the motives of the three defendants in the Texas Action. It is irrelevant to Media Matters's motives if nonparties donated to Media Matters out of a secret dislike for Musk—only Media Matters (not nonparties) has information regarding Media Matters's internal beliefs. *See N.C. Right to Life, Inc.*, 231 F.R.D. at 51 (quashing nonparty subpoena, holding that the only relevant bias was that of the parties, not of "an unrelated non-party"); *US Dominion Inc. v. My Pillow Inc.*, No. 21 Civ. 445, 2024 WL 2880425, at *5-6 (D.D.C. June 7, 2024) (denying enforcement of subpoena that sought information belonging to nonparties where party had not relied on that information at the time to make allegedly defamatory statements).

---

[7] Oral Argument at 18:40, *X Corp. v. Media Matters,* No. 24-10900 (5th Cir. Feb. 18, 2025), https://www.ca5.uscourts.gov/oral-argument-recordings?docket=24-10900.

Accordingly, even requests targeted precisely at these theories of relevance would not overcome the American Independent's First Amendment rights and justify the Subpoena. But the Subpoena is not so targeted. The first request, for instance, sweeps well beyond information consistent with X Corp.'s relevance arguments. It demands "all documents"—without any date limitation—concerning X, Musk, the Media Matters articles, the Texas Action, or "misinformation, content moderation, ad adjacencies, brand safety, or advertising." Ex. 26 at 14. Responsive documents could include communications sources, internal strategy discussions, personal correspondence with colleagues and acquaintances, and correspondence with other organizations about various topics of public importance, such as Musk—a public person who, until recently, held a high-level and highly-contested Executive Branch position—or misinformation, advertising, or brand safety more generally. Nor can X Corp. contend with a straight face that the communications of the American Independent, a media organization, regarding topics such as "advertising" or "misinformation," writ large, are relevant to its claims against Media Matters. Because the American Independent has no involvement in, or control over, Media Matters's journalism or publications, *see* Warner Decl. ¶¶ 12-13, the American Independent's communications and documents are irrelevant to this litigation, as none would bear on the state of mind or actions of the defendants.

The other requests suffer similar flaws. Requests 2 and 3, for instance, demand documents regarding Media Matters's relationship with advertisers and alleged efforts made to discourage advertising on X. Ex. 26 at 14. And Request 4 seeks "trainings, videos, conferences, or webinars hosted or circulated" by Media Matters, the Bonner Group, or Unbendable Media, while Request 5 seeks documents "from" Media Matters or The Bonner Group "soliciting donations or grants." *Id.* Once again, any documents responsive to these requests concerning the American

Independent's internal correspondence on these matters, or correspondence between the American Independent and third parties such as the Bonner Group, are irrelevant to Media Matters's knowledge or actions. Request 6 appears to be a blatant attempt to inquire into the American Independent's associational activities with other organizations and uncover irrelevant information about Musk's and X Corp.'s perceived enemies. By broadly requesting "[a]ll documents" concerning "Advocacy Campaigns," *see* Ex. 26 at 14, the request implicates dozens of organizations unrelated to the allegations or defenses in the underlying matter, *see supra* at 17-19. Each of these requests could implicate not only internal and personal correspondence, but correspondence with donors and confidential sources.

In sum, the Subpoena seeks information that is irrelevant to the Texas Action, which is about the alleged conduct of the named defendants, not nonparties. And even if it could show some tangential relevance or marginal utility to some portion of some requests, X Corp. does not come close to demonstrating that the information sought lies at the "heart of" or is "crucial to" its claims, and so cannot overcome the American Independent's well-established First Amendment privileges.

**D. X Corp. Can and Must Seek Information Elsewhere**

Even if X Corp. could demonstrate that the information it demands is truly crucial to the Texas Action, it cannot make the further required showing that it has sought the information through alternative sources and has been unable to obtain it. *See Int'l Action Ctr.*, 207 F.R.D. at 3-4; *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454-55 (D.D.C. 2002); *Zerilli*, 656 F.2d at 713.

If X Corp. wants to know what donations Media Matters received, who provided those donations to Media Matters, and what representations Media Matters made to those donors (or vice versa), then X Corp. should obtain that information directly from Media Matters rather than

burden nonparties. X Corp. cannot point to any reason why the documents it seeks are not obtainable from Media Matters directly, save for the uncomfortable fact that the Fifth Circuit has stayed X Corp.'s requests for that party discovery. *Supra* at 8-9. To state the obvious, a temporary stay does not amount to exhaustion. And a Fifth Circuit ruling blocking that party discovery would only weigh further against the improper nonparty effort at issue. Put another way, either X Corp. will ultimately get some limited donor information from Media Matters after the Fifth Circuit rules, or it cannot properly obtain that information at all. In no event should it be permitted to end-run party discovery by compelling the American Independent to hand that same discovery over directly.

Further, to the extent X Corp. seeks public statements by Media Matters's donors about Musk, they may obtain such statements from public sources without burdening nonparties. Even if the American Independent were to have documents concerning Media Matters's donations or strategies that are not in the possession, custody, or control of Media Matters, then those documents would be irrelevant because they would not bear on Media Matters's motivations. *See N.C. Right to Life, Inc.*, 231 F.R.D. at 51; Mehlhorn Opinion at 32 ("[T]he best sources for relevant information Petitioners could possess are those actually involved in the allegedly [unlawful conduct].").

Finally, X Corp. must also demonstrate that the Subpoena's requests are not impermissibly duplicative of documents and information that X Corp. has obtained already in the Texas Action. *See Phillips & Cohen, LLP*, 300 F.R.D. at 18. Based solely on public documents, Media Matters has produced an astonishing amount of discovery to date. As of March 2026, Media Matters had produced over 400,000 pages of documents in response to more than 200 requests for production by X Corp. Defs.' Opp. to X Corp.'s Mot. to Compel at 1, No. 23 Civ. 1175 (N.D. Tex. Mar. 11,

2026), ECF 275-1. Now, Media Matters's Bates stamps go well past 540,000. ECF 311 at 73. Those numbers do not even count the thousands of videos and other electronic data that Media Matters has produced. LeGrand Decl. ¶ 25, No. 23 Civ. 1175 (N.D. Tex. May 29, 2024), ECF 62-1. The Subpoena reflects zero effort to target anything that X Corp. might genuinely need from the American Independent to prosecute the Texas Action in light of the substantial discovery it has received already, and its demand that the American Independent produce a large volume of potentially duplicative materials is independent grounds to quash. *See In re Subpoena to Goldberg*, 693 F. Supp. 2d 81, 87 (D.D.C. 2010) (quashing nonparty deposition subpoena that sought duplicative testimony).

Because the Subpoena seeks a wide swath of materials protected by the First Amendment privilege, and X Corp. cannot show those materials are both crucial to the Texas Action and unavailable from any alternative source, this Court should quash the Subpoena.

## II. The Subpoena Imposes an Undue Burden on the American Independent

Independent of the fact that the American Independent Subpoena would require disclosure of privileged material, this Court should quash the Subpoena because it would subject the American Independent to undue burden. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv).

For the reasons explained above, *supra* at 24-27, X Corp. cannot show that the expansive categories of documents demanded from the American Independent are relevant to the Texas Action. On the other side of the scale, the Subpoena imposes substantial burdens on the American Independent if it were to comply. Those burdens start (but do not end) with the First Amendment privilege identified above, *supra* at 16-23, as well as the protections of the reporter's shield law, *supra* at 23-24, since those burdens, "however slight, [are] necessarily undue," *Gouse v. District of Columbia*, 359 F. Supp. 3d 51, 56 (D.D.C. 2019) (quoting *AF Holdings, LLC*, 752 F.3d at 995). Additionally, the same risks of retaliation, harassment, and chill described above provide a

sufficient basis for the Court to conclude that the Subpoena would impose a substantial burden that far exceeds any purported benefits of the information sought. *See X Corp.*, 120 F.4th at 198-99; *N.C. Right to Life, Inc.*, 231 F.R.D. at 52.

But the burdens on the American Independent do not stop there. The Subpoena's requests are facially broad in scope, are often vague in meaning, and impose no temporal limitation or date range at all. According to X Corp.'s Subpoena, every passing mention of "advertising," "content moderation," or "misinformation"—all topics of significant discussion in the publishing and newsgathering world—is responsive. The same is true for every mention of Elon Musk—one of the most influential and omnipresent individuals in the country over the last decade, and the subject of countless major news stories across publications in recent years. The absence of a date range alone is a basis to hold the Subpoena is "patently overbroad." *Benham v. Rice*, 238 F.R.D. 15, 19-27 (D.D.C. 2006); *United States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 97, 107 (S.D.N.Y. 1979) ("A demand for documents should cover a reasonable time period to insure that the materials desired are sufficiently identified and to confine the search to relevant documents."). The combination of broad terms with no meaningful limitations means that a huge swath of the American Independent's internal and external communications and documents—likely well into the thousands or tens of thousands—would be flagged as potentially *responsive* (albeit, not in any sense *relevant*) and require review by one of the American Independent's employees or by outside counsel. Warner Decl. ¶¶ 25; *see Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 174 n.9 (D.D.C. 1998) (concluding that even a search for relevant information imposed an undue burden where the "requested search does not contain time limitations").

Conservatively, identifying potentially relevant documents would likely require hundreds of hours of time both from the American Independent's staff and that of its attorneys and their staff

to collect the documents, review them, tag them, quality-check them, and process them for production. Warner Decl. ¶ 25. That burden would be substantial for any subpoenaed party, but it is particularly so for the American Independent Foundation, a small nonprofit organization with no in-house counsel whose employees have full-time responsibilities to operate newsrooms across the country and keep pace with a 24-hour news cycle. *Id.* ¶ 27. Time spent complying with the Subpoena will unavoidably trade off with the American Independent's core journalist activity, and the substantial cost to retain counsel to perform this review will necessarily burden the nonprofit's modest financial resources. *Id.* ¶¶ 25-27.

Under similar circumstances, courts in this District have not hesitated to conclude that a nonparty subpoena imposed an undue burden. *See, e.g.*, Mehlhorn Opinion at 30-32 (finding undue burden because review of potentially responsive documents "would require extensive expenditures on document reviewers, attorneys, and e-discovery vendors, even if few documents ended up being responsive") (internal quotations omitted); *In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d at 60-61 (subpoena imposes undue burden when "a non-party would be expected to review thousands of documents"); *N.C. Right to Life, Inc.*, 231 F.R.D. at 52 (subpoena imposed undue burden when it would "require an organization to sacrifice such a large proportion of its staff for several weeks"). The burden here would be greater still because the American Independent would need to take extra steps to protect the personally identifiable information of its sources, to the extent it is not ordered to disclose those, Warner Decl. ¶ 8, as well as to protect privileged information, donors' sensitive financial details, and other personally identifiable information that may not be produced, *see In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d at 60-61.

These significant costs—along with the serious invasion of the First Amendment privilege—when balanced against the total absence of legitimate discovery interests by X Corp., all point to the same conclusion: the Court should quash the Subpoena. Musk's and X Corp.'s public statements, and their years of vindictive litigation tactics, make plain that X Corp. is using nonparty discovery to further its efforts to retaliate against, harass, and punish any individual or group who publicly criticizes them or who exercises their right to support others who do. This abuse of the discovery process should be put to a swift and decisive end.

## III. In the Alternative, this Court Should Stay Enforcement of the Subpoena Pending the Fifth Circuit's Decision on X Corp.'s Similar Requests for Party Discovery

In the alternative, and at a minimum, the Court should issue a protective order that stays enforcement of the Subpoena pending a final decision on Media Matters's interlocutory appeal pending in the Fifth Circuit regarding X Corp.'s substantially similar requests for donor information and communications from Media Matters. *See supra* at 7-9; *X Corp. v. Media Matters for Am.*, No. 24-10900 (5th Cir.). As the Fifth Circuit's stay decision made clear, the discovery requests at issue there overlap significantly with the Subpoena, including because they seek information on all Media Matters donors, communications with donors, solicitations to donors (and potential donors), and sources of funding for Media Matters's research. *Compare X Corp.*, 120 F.4th at 194, *with* Ex. 26 at 14 (requesting similar information from the Foundation). There is thus every reason to expect that the Fifth Circuit's holding will bear directly on donor-related discovery that X Corp. is permitted to obtain. At a minimum, the decision could provide important guidance and limiting principles, and bear on the question of alternative sources. *Supra* at 27-29.

Indeed, were the American Independent required to produce documents in response to the Subpoena before the Fifth Circuit's decision is issued, the American Independent could, as a nonparty, be required to produce documents that Media Matters, a named party, need not produce,

if the Fifth Circuit limits X Corp.'s requests consistent with its earlier stay decision. That result would flip the structure of nonparty discovery, with its special sensitivity to burden and cost and nonparty status, on its head. *Contra Watts*, 482 F.3d at 509; *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980).

Accordingly, under Rule 26(c)(1), and the Court's inherent power to manage its docket, the Court should issue a protective order that prevents enforcement of the Subpoena at least until the Fifth Circuit has issued a final decision. *See, e.g.*, *In re Subpoena to Wang*, 214 F. Supp. 3d 91, 95-96 (D.D.C. 2016) (staying nonparty deposition pending resolution of discovery dispute over privilege in the Northern District of California that could determine propriety of some questions to be asked to minimize the burden on a nonparty); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (recognizing courts' inherent power to stay cases to manage their docket). To be sure, if the Fifth Circuit permits certain discovery of Media Matters, that decision would not resolve this motion, since the American Independent is a nonparty and resident of DC entitled to the protections of this Circuit's First Amendment privilege and DC's reporter's shield law. That is why the American Independent has sought an order quashing the Subpoena in full. But as noted, a stay would at least permit the Fifth Circuit's guidance, and clarity around party discovery, to be accounted for. And a stay of enforcement would not prejudice X Corp., since it has stated it will wait for the Fifth Circuit's decision before proceeding to trial, *see* Joint Motion to Amend Scheduling Order, No. 23 Civ. 1175 (N.D. Tex. Sept. 8, 2026), ECF 363, and it would further conserve judicial, party, and nonparty resources, *see Stone v. Trump*, 356 F. Supp. 3d 505, 518 (D. Md. 2018) (staying enforcement of discovery order pending decision by the Ninth Circuit in case involving similar discovery issues).

## CONCLUSION

For the foregoing reasons, the Court should quash the Subpoena or, in the alternative, issue a protective order.

## RULE 7(m) STATEMENT

As set forth herein, counsel for the American Independent Foundation has engaged in discussions with counsel for X Corp. in an attempt to resolve this matter without the necessity of this motion but the parties have been unable to reach an agreement.

Dated: September 14, 2026

Respectfully submitted,

Amy Jeffress, Bar No. 449258
Jackson Erpenbach, Bar No. 1735493
Rachel Freeh*
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
rfreeh@heckerfink.com

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

**pro hac vice applications forthcoming*

*Attorneys for Nonparty The American Independent Foundation*