**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE AMERICAN INDEPENDENT FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-mc-00130-RJL |
| | ) | |
| X CORP., | ) | Underlying Litigation: |
| | ) | *X Corp. v. Media Matters for America* |
| Defendant. | ) | No. 23 Civ. 01175 (N.D. Tex.) |

**X CORP.'S RESPONSE TO THE AMERICAN INDEPENDENT FOUNDATION'S MOTION TO QUASH X CORP.'S NONPARTY SUBPOENA OR FOR A PROTECTIVE ORDER**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1
FACTUAL BACKGROUND ........................................................................................ 3
I. X's Claims in the Underlying Litigation ................................................................ 3
II. Procedural History of the Underlying Litigation ..................................................... 5
III. AIF and X's Subpoena .......................................................................................... 5
LEGAL STANDARD .................................................................................................. 7
ARGUMENT ............................................................................................................... 8
I. AIF's Motion Should Be Denied Because It Failed to Confer. ................................ 8
II. The First Amendment Does Not Bar Enforcement of the Subpoena. ...................... 9
A. AIF has not made a threshold showing of a First Amendment injury. ................... 11
B. X's need for the documents outweighs any interest AIF asserts. .......................... 15
III. The D.C. Shield Law Does Not Bar Enforcement of the Subpoena. ....................... 18
IV. The Subpoena Satisfies Rules 45 and 26. ............................................................... 20
A. The subpoena seeks relevant, proportional discovery. .......................................... 20
B. The information sought is not available from a more convenient source. .............. 21
C. The subpoena does not impose an undue burden. ................................................. 22
V. The Court Should Decline to Stay the Subpoena. .................................................... 25
CONCLUSION ............................................................................................................ 27

## TABLE OF AUTHORITIES

### Cases

*AF Holdings, LLC v. Does 1-1058*,
752 F.3d 990 (D.C. Cir. 2014) ........ 20

*Alexander v. FBI*,
186 F.R.D. 185 (D.D.C. 1999) ........ 9

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........ 10, 13, 24

*Anderson v. Hale*,
2001 WL 503045 (N.D. Ill. May 10, 2001) ........ 13

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
837 F. Supp. 454 (D.D.C. 1993) ........ 22

*Ballard v. Wall*,
413 F.3d 510 (5th Cir. 2005) ........ 10

*Benham v. Rice*,
238 F.R.D. 15 (D.D.C. 2006) ........ 23

*Black Panther Party v. Smith*,
661 F.2d 1243 (D.C. Cir. 1981), *vacated as moot sub nom. Moore v. Black Panther Party*, 458 U.S. 1118 (1982) ........ 11

*Bright Response, LLC v. Google Inc.*,
2009 WL 10741629 (E.D. Tex. Sept. 29, 2009) ........ 25

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........ 10

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989) ........ 15

*Coleman v. District of Columbia*,
275 F.R.D. 33 (D.D.C. 2011) ........ 7

*Colson v. Grohman*,
174 F.3d 498 (5th Cir. 1999) ........ 2, 14

*Dawson v. Delaware*,
503 U.S. 159 (1992) ........ 14

*Dell Inc. v. DeCosta*,
233 F. Supp. 3d 1 (D.D.C. 2017) ........ 22

*Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*,
950 F.2d 1456 (9th Cir. 1991) ........ 24

*Ellipso, Inc. v. Mann*,
460 F. Supp. 2d 99 (D.D.C. 2006) ........ 9

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
2019 WL 5864595 (D.D.C. Nov. 8, 2019) .......... 22, 23

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) .......... 10, 25

*Flanagan v. Wyndham Int'l, Inc.*,
231 F.R.D. 98 (D.D.C. 2005) .......... 8

*Flatow v. Islamic Republic of Iran*,
196 F.R.D. 203 (D.D.C. 2000) .......... 22

*Forbes Inc. v. Granada Biosciences, Inc.*,
124 S.W.3d 167 (Tex. 2003) .......... 16

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .......... 17

*Henry v. First Nat'l Bank of Clarksdale*,
444 F.2d 1300 (5th Cir. 1971) .......... 10

*Herbert v. Lando*,
441 U.S. 153 (1979) .......... 14, 18

*Horizons Titanium Corp. v. Norton Co.*,
290 F.2d 421 (1st Cir. 1961) .......... 8

*Hurlbut v. Gulf Atl. Life Ins. Co.*,
749 S.W.2d 762 (Tex. 1987) .......... 17

*In re Kincaid*,
2023 WL 6459801 (D.D.C. Oct. 4, 2023) .......... 10, 11

*In re Media Matters for Am.*,
187 F.4th 362 (5th Cir. 2026) .......... 5

*In re Novo Nordisk Sec. Litig.*,
530 F. Supp. 3d 495 (D.N.J. 2021) .......... 21

*In re Sealed Case*,
971 F.3d 324 (D.C. Cir. 2020) .......... 12

*In re Subpoena to Goldberg*,
693 F. Supp. 2d 81 (D.D.C. 2010) .......... 22

*In re Subpoena to Wang*,
214 F. Supp. 3d 91 (D.D.C. 2016) .......... 26

*Int'l Action Ctr. v. United States*,
207 F.R.D. 1 (D.D.C. 2002) .......... 21

*Klayman v. Judicial Watch, Inc.*,
2008 WL 11394177 (D.D.C. Jan. 8, 2008), *aff'd*, 2008 WL 11394172 (D.D.C. Apr. 2, 2008) .......... 25

*Lamaute v. Power*,
339 F.R.D. 29 (D.D.C. 2021) .......... 7

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ... 26

*Linder v. Calero-Portocarrero*,
180 F.R.D. 168 (D.D.C. 1998) ... 23

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ... 10

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ... 10

*Mannina v. O'Keefe Media Grp.*,
2026 WL 2186418 (D.D.C. July 29, 2026) ... 11, 19

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ... 15

*N.C. Right to Life, Inc. v. Leake*,
231 F.R.D. 49 (D.D.C. 2005) ... 18

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) ... 10

*Nat'l Org. for Marriage v. McKee*,
723 F. Supp. 2d 236 (D. Me. 2010) ... 25

*Nix v. Major League Baseball*,
62 F.4th 920 (5th Cir. 2023) ... 16

*Northrop Corp. v. McDonnell Douglas Corp.*,
751 F.2d 395 (D.C. Cir. 1984) ... 22

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) ... 20

*Payne v. District of Columbia*,
859 F. Supp. 2d 125 (D.D.C. 2012) ... 8

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ... 14

*Phillips & Cohen, LLP v. Thorpe*,
300 F.R.D. 16 (D.D.C. 2013) ... 20

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ... 14

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ... 15

*Stone v. Trump*,
356 F. Supp. 3d 505 (D. Md. 2018) ... 26

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) ... 15

*U.S. Commodity Futures Trading Comm'n v. Whitney*,
441 F. Supp. 2d 61 (D.D.C. 2006) .... 20

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
235 F.R.D. 521 (D.D.C. 2006) .... 9

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
202 F. Supp. 3d 1 (D.D.C. 2016) .... 9

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989) .... 13

*US Dominion Inc. v. My Pillow Inc.*,
2024 WL 2880425 (D.D.C. June 7, 2024) .... 20

*Vendever LLC v. Intermatic Mfg. Ltd.*,
2011 WL 4346324 (N.D. Tex. Sept. 16, 2011) .... 16

*Westinghouse Elec. Corp. v. City of Burlington*,
351 F.2d 762 (D.C. Cir. 1965) .... 7, 25

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) .... 14, 18

*Wyoming v. U.S. Dep't of Agric.*,
208 F.R.D. 449 (D.D.C. 2002) .... 21

*X Corp. v. Media Matters for Am.*,
120 F.4th 190 (5th Cir. 2024) .... 5, 26

*X Corp. v. Media Matters for Am.*,
2024 WL 4416887 (N.D. Tex. Sept. 27, 2024) .... 5, 10, 15, 16

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .... 12

**Statutes**

D.C. Code § 16-4702(1) .... 19

D.C. Code § 16-4702(2) .... 19

D.C. Code § 16-4703(a) .... 19

Tex. Civ. Prac. & Rem. Code § 41.001(7) .... 17

Tex. Civ. Prac. & Rem. Code § 41.003(a) .... 17

**Other Authorities**

Accountable Tech, *Stop The Deal: Nonprofit Coalition Launches Campaign Against Elon Musk's Twitter Takeover* (June 3, 2022), https://accountabletech.org/statements/stop-the-deal-nonprofit-coalition-launches-campaign-against-elon-musks-twitter-takeover/ .... 3

Mem. Op. & Order, *Mehlhorn v. No Labels*, No. 24-mc-101 (EGS) (D.D.C. Dec. 23, 2024), ECF No. 20-1 .... *passim*

Michael Scherer, *Newspapers with a partisan aim filling the void of traditional media*, Wash. Post (updated Oct. 15, 2022), https://www.washingtonpost.com/politics/2022/10/14/newspapers-partisan-midterms/ ........... 6

**Rules**

Fed. R. Civ. P. 45(d)(3)(A) ........ 25

Fed. R. Civ. P. 45(d)(3)(A)(iv) ........ 22

Fed. R. Civ. P. 45(e)(2)(A) ........ 15, 20

## INTRODUCTION

In November 2023, Media Matters for America published defamatory articles claiming that advertisements from blue-chip companies were being "placed" next to controversial content on X Corp.'s social media platform. Those articles were designed to drive advertisers off the platform and starve X of its primary revenue source unless it abandoned its commitment to free speech. X sued Media Matters in the Northern District of Texas for business disparagement and tortious interference after the articles led to significant advertiser departures. *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175-O (N.D. Tex. Nov. 20, 2023). In connection with that litigation, which has proceeded into extensive discovery following multiple unsuccessful motions to dismiss, X served a subpoena on nonparty The American Independent Foundation (AIF), a major, repeat funder of Media Matters that shares Media Matters' founder, David Brock. AIF now moves to quash the subpoena wholesale by recasting a funder's grant files as protected journalism. AIF cites no authority treating them that way, and there is none.[1]

The subpoena is directed to AIF as Media Matters' funder, not as a news organization; it does not seek AIF's confidential sources or unpublished newsgathering materials. *Contra* Mot. to Quash at 24 ("Mot."). Instead, the subpoena seeks documents about AIF's support of and communications with Media Matters relating to X. The subpoena thereby implicates core issues in the underlying litigation: among others, whether Media Matters acted with actual malice, whether Media Matters possessed a willful intent to disrupt X's relationships with advertisers, and whether Media Matters had specific financial or institutional motives for targeting X. Indeed, the

[1] X separately moves under Rule 45(f) to transfer AIF's motion to the Northern District of Texas, where X has pursued its claims against Media Matters. X submits this response should this Court reach the merits.

issuing court has already held that this very category of material is probative of Media Matters' mental state and punitive-damages exposure.

AIF's own records are independently and uniquely important. Contemporaneous notes of Media Matters' pitches and AIF's deliberations about funding Media Matters show what AIF understood Media Matters to be doing, evidence that Media Matters does not possess and cannot produce. AIF's insistence that X must obtain this information from Media Matters instead has no basis in law. Nor is AIF the disinterested bystander it portrays itself to be. By its own account, AIF counts Media Matters among the "like-minded organizations" with which it associates. And AIF gave Media Matters donations of $810,500 in 2023, the year the disputed articles were published, and $1 million in 2024, *after* the articles and after this suit was filed, all disclosed in AIF's own public tax filings. Mot. at 2, 6 & n.5. Much of AIF's motion is devoted to other litigation and government investigations involving Media Matters, *id.* at 3-10, none of which bears on whether this subpoena seeks relevant information.[2]

The considerations that are properly before the Court should result in the denial of AIF's motion. AIF moved without conferring as Local Civil Rule 7(m) requires; the Supreme Court has not held that the First Amendment limits discovery between private litigants, and even under the

---

[2] AIF's invocation of unrelated decisions that enjoined governmental investigations of Media Matters is particularly far afield. Mot. at 9-10. X was not a party to those cases, which addressed *government officials'* investigative demands that sought, among other things, the identities of all of Media Matters' donors. *Id.* at 9. The subpoena here is a private litigant's request for documents in a pending case, and it does not seek the identity of any donor. Nor could those decisions resolve the question this suit presents. Because "intentional or reckless falsehood" of the sort X alleges "enjoys no First Amendment protection," *Colson v. Grohman*, 174 F.3d 498, 507 (5th Cir. 1999), whether Media Matters' articles are constitutionally protected depends on the ultimate merits of X's claims, which no court has yet decided. And the Northern District of California's unsupported accusation that X intended to "bully" Media Matters, Mot. at 5, was delivered in an order that was vacated on appeal (as AIF acknowledges). Soon thereafter, Media Matters dismissed its lawsuit against X in California with prejudice. *Media Matters for Am. v. X Corp.*, No. 3:25-cv-02397-VC (N.D. Cal. Mar. 12, 2026), ECF No. 105.

balancing test courts in this district have applied, X's need for evidence at the heart of its claims far outweighs the limited interests that AIF asserts. AIF's remaining objections fare no better: the D.C. shield law protects newsgathering, not a funder's grant files; the subpoena seeks relevant, proportional discovery that is not available from Media Matters; AIF has made no particularized showing of undue burden; and there is no basis to delay discovery further through a stay.

## FACTUAL BACKGROUND

### I. X's Claims in the Underlying Litigation

Media Matters is a self-described "progressive research and information center" that has waged what it has called "guerilla warfare and sabotage" against conservative news sources. Amended Complaint ¶ 2, *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175-O (N.D. Tex. Feb. 27, 2024), ECF No. 37 ("Am. Compl."). In 2022, Elon Musk's acquisition of Twitter landed in its crosshairs. First, Media Matters participated in a campaign called Stop the Deal to make the acquisition "financially nonviable by targeting major Twitter advertisers whose revenue is critical for the company's bottom line."[3] When that tactic failed, Media Matters joined an open "coalition letter" urging the platform's largest advertisers to "cease all advertising" if Musk changed its content-moderation policies. Am. Compl. ¶ 33. Angelo Carusone, Media Matters' president, explained around the time that Twitter "really just need[s] blue-chip advertisers." *Id.* ¶ 34. To convince them to abandon the platform following the acquisition, Media Matters published over twenty articles falsely lambasting Twitter (operating as X since July 2023) as a risky, unsafe platform for advertisers. *Id.* ¶ 4.

---

[3] *See* Accountable Tech, *Stop The Deal: Nonprofit Coalition Launches Campaign Against Elon Musk's Twitter Takeover* (June 3, 2022), https://accountabletech.org/statements/stop-the-deal-nonprofit-coalition-launches-campaign-against-elon-musks-twitter-takeover/ (listing Media Matters as a founding member of the #StopTheDeal coalition).

Media Matters' own sworn interrogatory responses confirm that campaign. Media Matters admits that it belongs to the Stop Toxic Twitter coalition, a group "calling on Twitter advertisers to demand a safer Twitter for their brands and for users." Def. Media Matters for Am.'s Resps. & Objs. to Pl.'s First Interrogs. (July 19, 2024), *X Corp. v. Media Matters for Am.*, No. 4:23-cv-01175-O (N.D. Tex. Aug. 30, 2024), ECF No. 85 at 167 ("MMFA Interrog. Resps."). It admits that from June to November 2023 it discussed with coalition members the subject of the articles, "X's ability (or inability) to prevent advertisements from appearing next to extremist content"; that before publication it "discussed [its] general plan to publish information about X's apparent monetization of extremist content" with coalition members; and that it then "circulated those articles to the Stop Toxic Twitter Coalition email list." *Id.* at 170-71.

In furtherance of those objectives, on November 16, 2023, Media Matters published an article claiming that "X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." Am. Compl. ¶ 46. A similar article followed the next day. *Id.* ¶ 3 n.3. Eric Hananoki, the author of the article, built an account following only a small, curated set of users (some notorious for fringe content, others major brands), then refreshed that feed until a major brand advertisement appeared next to extremist content. *Id.* ¶¶ 48-54. The results were extraordinarily rare: for several featured advertisers, Hananoki was the only one of more than 500 million X users to see the pairing, and the pairings Media Matters published represented approximately 0.0000009% of that day's impressions. *Id.* ¶ 57. But Carusone told a national television audience that Media Matters did nothing more than "use Twitter the way a normal user would." *Id.* ¶ 13.

X alleged that, relying on the articles, major advertisers including Apple, Comcast, NBCUniversal, and IBM pulled their advertising from the platform. *Id.* ¶ 61. Several days after

the articles were published, X sued Media Matters and Hananoki in the Northern District of Texas, later adding Carusone, bringing claims for business disparagement, interference with contract, and interference with prospective economic advantage. *Id.* ¶¶ 19-21, 65-88.

## II. Procedural History of the Underlying Litigation

X served requests for production on Media Matters in February and March 2024, requesting materials bearing on Media Matters' donor solicitations and communications. The issuing court first ordered Media Matters to search for responsive documents and log any privilege claims, and Media Matters refused to comply with that order. *X Corp. v. Media Matters for Am.*, 2024 WL 4416887, at *3 (N.D. Tex. Sept. 27, 2024). The issuing court then granted X's motion to compel, holding that X's "donor related document[]" requests, "particularly ones that are demonstrative of Defendants' mental state . . . go[] to the heart of the matter and [X] is significantly burdened without the documents." *Id.* at *9 (second alteration in original) (internal quotation marks omitted); *see id.* at *10.

The Fifth Circuit stayed that order pending appeal but did not reject X's theory of relevance. *Contra* Mot. at 8-9. Rather, it "agree[d] with the district court that the communications could otherwise be relevant to X Corp.'s theories." *X Corp. v. Media Matters for Am.*, 120 F.4th 190, 199 (5th Cir. 2024). The appeal is now held in abeyance pending resolution of Media Matters' second petition for a writ of mandamus seeking a transfer of the litigation to the Northern District of California. *See In re Media Matters for Am.*, 187 F.4th 362, 372 (5th Cir. 2026); Mot. at 9 & n.6.

## III. AIF and X's Subpoena

AIF presents itself as a nonprofit news organization with no stake in this dispute. *See* Mot. at 1-2, 10-11. Its own statements reflect otherwise. AIF "awards grants to other nonprofit organizations that align with its mission," *id.* at 1; *see* Decl. of Cathleen Warner ¶ 10, ECF No. 1-

2 ("Warner Decl."), and it counts Media Matters among the "like-minded organizations" with which it associates, Mot. at 2. AIF and Media Matters share a founder, David Brock. *See* Michael Scherer, *Newspapers with a partisan aim filling the void of traditional media*, Wash. Post (updated Oct. 15, 2022), https://www.washingtonpost.com/politics/2022/10/14/newspapers-partisan-midterms/. And AIF is one of Media Matters' major funders. By AIF's own account, its Forms 990 show that it granted Media Matters $810,500 in 2023, the year the articles were published, and $1 million in 2024, after the articles and X's lawsuit. Mot. at 6 & n.5; Warner Decl. ¶ 11 (grants to Media Matters and Media Matters Action Network).

That funding was never secret. AIF reported its grants on its Forms 990, which are publicly available from the IRS, and AIF itself calls its "prior financial support of Media Matters" "public information." Mot. at 6 & n.5. The "purported leak" that AIF invokes, *id.* at 7, 21, was a January 2024 newspaper article naming five individuals and foundations said to be Media Matters donors, *id.* at 5. AIF does not contend that it was among them, or that anyone has harassed it because of its publicly reported grants. *See* Warner Decl. ¶¶ 23-24.

On August 10, 2026, X served a subpoena for documents on AIF. ECF No. 1-2 at 159. Its six requests seek documents concerning Media Matters' solicitations of grants, any conditions attached to those grants, the trainings and webinars that Media Matters circulated, the campaigns aimed at X's advertisers, and X, Musk, the articles, and related brand-safety and advertising topics, along with any internal communications or deliberations regarding the same. *Id.* at 170. Media Matters also raises money through The Bonner Group, a professional fundraising firm that counts Media Matters among its clients and advises clients on their "messaging to donors," and three of the subpoena's requests reach The Bonner Group's solicitations, trainings, and plans concerning X. *See* Decl. of Allison Thompson ¶¶ 3, 7, 10, *The Bonner Group v. X Corp.*, No. 1:26-mc-00129-

RJL-MJS (D.D.C. Sept. 14, 2026), ECF No. 1-2; *see also* ECF No. 1-2 at 170. Despite AIF's assertion that the subpoena "impose[s] no temporal limitation or date range at all," Mot. at 30, the subpoena's instructions limit every request to the period from April 14, 2022, when Musk offered to acquire Twitter, through November 1, 2024. ECF No. 1-2 at 168-69.

X twice extended AIF's deadline to respond to the subpoena, ultimately resulting in a deadline of September 18, 2026. Decl. of Jackson Erpenbach ¶¶ 29-30, ECF No. 1-1. On September 8, AIF's counsel proposed that X withdraw the subpoena until the Fifth Circuit decides Media Matters' pending interlocutory appeal, after which "X Corp. may consider narrower, more appropriately tailored versions of the subpoena[]." ECF No. 1-2 at 176. X responded that it would be more efficient to confer once AIF had served its objections and offered to "schedule a time to meet and confer" if there "is another issue you would like to discuss." *Id.* Four days before its response deadline, and without identifying any specific objections to the requests, definitions, or instructions, AIF moved to quash.

**LEGAL STANDARD**

A Rule 45 subpoena is subject to the same relevance standard as Rule 26(b)(1), under which a request is relevant if there is any possibility it may bear on a claim or defense and should be allowed unless the information sought can have no possible bearing on one. *Coleman v. District of Columbia*, 275 F.R.D. 33, 36 (D.D.C. 2011). "Once relevance has been established, the burden shifts to the party opposing discovery to show why the discovery should not be permitted." *Lamaute v. Power*, 339 F.R.D. 29, 35 (D.D.C. 2021). "To satisfy that burden the refusing party must make a specific, detailed showing." *Id.* "The burden of proving that a subpoena duces tecum is oppressive is on the party moving for relief on this ground." *Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762, 766 (D.C. Cir. 1965). "The burden is particularly heavy to support a

'motion to quash as contrasted to some more limited protection.'" *Id.* (quoting *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961)). Quashing a subpoena is accordingly an extraordinary measure. *See Payne v. District of Columbia*, 859 F. Supp. 2d 125, 131 (D.D.C. 2012); *Flanagan v. Wyndham Int'l, Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005).

## ARGUMENT

AIF's motion fails for five reasons. *First*, AIF failed to satisfy the meet and confer requirement of Local Rule 7(m). *Second*, under the associational-privilege framework, AIF has not met its burden because (a) the subpoena is directed to AIF's publicly disclosed funding of Media Matters, not its journalism, so producing the documents poses no realistic risk of reprisal, and (b) X's need for the documents outweighs AIF's asserted interests. *Third*, the D.C. shield law does not reach a funder's grant decisions. AIF's insistence that X has sought confidential sources or targeted its "newsgathering" is a blatant misreading of the subpoena; it targets AIF's role as a Media Matters donor. *Fourth*, the subpoena readily satisfies Rule 45. Discovery that meets the First Amendment's heightened showing necessarily meets Rule 26's broader relevance standard, and AIF has not shown undue burden: its objections depend on a date-range omission the subpoena does not have and on burden figures that appear nowhere in AIF's declaration. *Fifth*, the Fifth Circuit's preliminary stay of party discovery is no reason to delay a nonparty's production.

### I. AIF's Motion Should Be Denied Because It Failed to Confer.

Local Civil Rule 7(m) mandates that "[b]efore *filing* any nondispositive motion in a civil action, counsel shall discuss the *anticipated motion* with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement." LCvR 7(m) (emphasis added). AIF's boilerplate statement—"counsel for the American Independent Foundation has engaged in discussions with counsel for X Corp. in an attempt to resolve this matter without the necessity of this motion but the parties have been unable

to reach an agreement," Mot. at 34—fails this standard because at no point in the parties' communications did counsel for AIF put counsel for X on notice that it would be moving to quash the subpoena in question, ECF No. 1-2 at 176-83. "The purpose of the Local Rule is to promote the resolution of as many litigation disputes as possible without court intervention, or at least to force the parties to narrow the issues that must be brought to the court." *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 102 (D.D.C. 2006).

The certification requirement imposed by Rule 7(m) is meaningful and serves critical case-management functions. It facilitates pre-motion dialogue between the parties and helps preserve limited judicial resources. AIF made no attempt to confer on the substantive issues raised in its motion, nor did it inform X that it planned to move to quash. It made an all-or-nothing demand: that X withdraw the subpoena; then, depending on the outcome of the Media Matters' donor appeal at the Fifth Circuit, that X then "may consider narrower, more appropriately tailored versions of the subpoenas later on." ECF No. 1-2 at 176-77. That does not meet the clear language of Rule 7(m) of providing notice of an anticipated motion and then attempting, in good faith, to narrow the scope of disagreement. Courts in this district have found such failures to confer sufficient to deny or dismiss motions outright. *See Alexander v. FBI*, 186 F.R.D. 185, 187 (D.D.C. 1999); *Ellipso*, 460 F. Supp. 2d at 102; *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 235 F.R.D. 521, 528 (D.D.C. 2006). "Indeed, even if the movant is sure that his opponent will not concede one inch of ground, he must still make a good-faith effort to confer." *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 202 F. Supp. 3d 1, 6 (D.D.C. 2016).

## II. The First Amendment Does Not Bar Enforcement of the Subpoena.

The Supreme Court has never held that the First Amendment limits discovery between private litigants. The Amendment's text restrains government: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The Free Speech Clause

thus "prohibits only governmental abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). And each of the Supreme Court's compelled-disclosure decisions on which AIF relies involved a governmental demand. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 451-53 (1958) (state attorney general); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 600-02 (2021) (same); *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 178-80 (2026) (same); *Buckley v. Valeo*, 424 U.S. 1, 64-66 (1976) (per curiam) (federal disclosure statute).

To be sure, courts in this district and several courts of appeals have applied a First Amendment privilege to subpoenas issued by private litigants, *see In re Kincaid*, 2023 WL 6459801, at *4 (D.D.C. Oct. 4, 2023); Mem. Op. & Order at 16-17, *Mehlhorn v. No Labels*, No. 24-mc-101 (EGS) (D.D.C. Dec. 23, 2024), ECF No. 20-1 ("*Mehlhorn* Op."); Mot. at 22-23 (collecting cases), and the issuing court declined to hold the privilege categorically inapplicable to discovery between private parties, *X Corp.*, 2024 WL 4416887, at *9. But it is unclear how that extension squares with the First Amendment's focus on governmental action, and AIF does not explain otherwise. *See Henry v. First Nat'l Bank of Clarksdale*, 444 F.2d 1300, 1312 (5th Cir. 1971) ("[T]here is no 'state action' to be found in the mere filing of a private civil tort action in state court."); *see also Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005) ("Private individuals generally are not considered to act under color of law, i.e., are not considered state actors, and 'private misuse of a state statute does not describe conduct that can be attributed to the State.'" (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982))).

Even so, if the First Amendment applies to X's Rule 45 subpoena for documents, courts in this district employ a two-step analysis. *Mehlhorn* Op. at 16. First, the party resisting discovery must demonstrate a cognizable First Amendment interest by showing "some probability that

disclosure will lead to reprisal or harassment." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981), *vacated as moot sub nom. Moore v. Black Panther Party*, 458 U.S. 1118 (1982). Second, the court balances that interest against the requesting party's need, considering "whether the information requested goes to the 'heart of the lawsuit' and whether the requesting party can or has attempted to obtain the information elsewhere." *Mehlhorn* Op. at 16-17 (quoting *Kincaid*, 2023 WL 6459801, at *4).

**A. AIF has not made a threshold showing of a First Amendment injury.**

AIF contends that the subpoena threatens to chill its newsgathering, the identity of confidential sources, the privacy of its donations and donors, its association with Media Matters and other organizations, and its communications that mention Musk or X. Mot. at 16-23; Warner Decl. ¶¶ 7-24. As to each interest, addressed in turn below, AIF has not shown "some probability that disclosure will lead to reprisal or harassment." *Black Panther Party*, 661 F.2d at 1267-68. Two features of the subpoena, common to each interest, demonstrate why. First, as explained above, the subpoena is directed to AIF as Media Matters' funder, not as a newsroom. It seeks what Media Matters told AIF, what AIF asked of Media Matters, and what AIF knew of the campaign it funded, all within a period that ends on November 1, 2024—all information arising from AIF's role as a Media Matters donor. Second, and relatedly, the relationship at issue is already public. AIF itself describes its "prior financial support of Media Matters" as "public information." Mot. at 6. Contrary to AIF's characterization, AIF's donor status was not revealed after a "purported leak," Mot. at 7, but was disclosed in AIF's own public tax filings. Producing what was said within a publicly known funding relationship under a protective order, *see* Part IV.C, *infra*, adds no meaningful risk of reprisal, and AIF identifies none. "Speculative assertions of harm will not suffice." *Mannina v. O'Keefe Media Grp.*, 2026 WL 2186418, at *7 (D.D.C. July 29, 2026)

(quoting *In re Sealed Case*, 971 F.3d 324, 326 (D.C. Cir. 2020)). Yet speculation is all that AIF offers.

***Newsgathering.*** This is not a reporter's-privilege case. AIF insists that the subpoena would expose its confidential sources, drafts, and reporters' notes, Mot. at 20; Warner Decl. ¶¶ 17-19, and it contends that the threshold showing of a chilling injury is met automatically "[w]here confidential newsgathering material is sought," Mot. at 15. But X does not seek, and does not ask AIF to produce, the identities of AIF's confidential sources or its unpublished newsgathering materials. AIF's principal authority, *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), involved civil litigants' demand that a nonparty reporter identify his confidential sources. *Id.* at 707-08, 712-14. X makes no such demand, as a simple conference between counsel would have made clear. Five of the subpoena's six requests are framed around Media Matters, its fundraiser (The Bonner Group), or the campaigns directed at X and its advertisers. ECF No. 1-2 at 170. The reporting AIF describes also falls outside the subpoena's time period in any event: each of the articles about Musk that AIF cites was published after November 1, 2024. Mot. at 6-7 & Exs. 19-25. AIF predicts harm only "if" its confidential sources are revealed, Warner Decl. ¶ 23, and the subpoena does not seek them.

Meanwhile, AIF's suggestion that its files about Media Matters might still contain source material is speculative: its declarant says only that responsive materials "could include communications with confidential sources" and that it is "likely" AIF received communications from "potential or actual confidential sources." Warner Decl. ¶¶ 17, 19. If a particular responsive document would reveal a source or unpublished newsgathering material, AIF may withhold or redact it and log it. ECF No. 1-2 at 167-68; Fed. R. Civ. P. 45(e)(2)(A). That document-by-document process, not wholesale quashal, is how such claims are resolved.

***Privacy of Donations and Donors.*** AIF contends that the subpoena threatens the privacy of "both its donations made and those received." Mot. at 20; *see* Warner Decl. ¶¶ 7-9, 16. As to donations made, AIF's grants to Media Matters are disclosed in its own public filings, Mot. at 6 & n.5, and AIF does not claim that it has been harassed because of them. *See* Factual Background § III, *supra*. The posts AIF recounts, Mot. at 5-6, targeted other donors named in a January 2024 online newspaper article, not AIF, and were made by third-party users of the platform. AIF responds that "each new disclosure 'brings with it an additional risk of chill.'" Mot. at 19 (quoting *Bonta*, 594 U.S. at 617-18). But *Bonta* concerned a charity's *confidential* list of major donors, which California demanded even though the charity had already provided it, in confidence, to the IRS. 594 U.S. at 618. AIF's support for Media Matters is already public, so producing documents about that relationship reveals no new association. As to donations received, no request asks AIF to identify its own donors—the subpoena concerns only AIF's publicly disclosed grants to Media Matters—and AIF predicts harm only "if" its donors are revealed. Warner Decl. ¶ 23. Where a subpoena seeks the substance of communications and any disclosure of identities is incidental rather than its "specific objective," the associational concern is diminished. *United States v. Comley*, 890 F.2d 539, 544 (1st Cir. 1989); *see Anderson v. Hale*, 2001 WL 503045, at *7 (N.D. Ill. May 10, 2001).

***Association With Media Matters and Other Organizations.*** AIF contends that production would expose its "private associations with like-minded organizations" and reveal "the duration, purpose, and extent" of its relationships with Media Matters, its fundraiser, and other organizations. Mot. at 17-18. But AIF's relationship with Media Matters is a matter of public record, Mot. at 6, and the core of the subpoena seeks Media Matters' speech: what Media Matters told AIF to secure its funding. Communications between an organization and an outside funder

are not the sort of private strategy discussions among an organization's core members that some courts have protected. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1165 n.12 (9th Cir. 2010). *Perry* protected a campaign's internal deliberations about its own strategy and messaging, *see id.*, while AIF's funding deliberations record what an outside party, Media Matters, told AIF about that outside party's work.

Where, as here, the plaintiff must prove the defendant's state of mind, the First Amendment neither shields the defendant's statements from discovery, *Herbert v. Lando*, 441 U.S. 153, 169-70 (1979), nor bars "the evidentiary use of speech . . . to prove motive or intent," *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see Dawson v. Delaware*, 503 U.S. 159, 165 (1992). AIF also notes that charitable solicitation is protected speech. Mot. at 19 (citing *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789-90, 794 (1988)). Protected speech is not categorically shielded from discovery; *Herbert* and *Mitchell* hold as much.

Lastly, AIF avers that it is "less willing to associate with Media Matters because of the Texas Action," and that its staff has limited stories about Musk for the same reason. Warner Decl. ¶ 24; *see* Mot. at 7 (asserting that "the existence of the Subpoena could further chill any such reporting"). Any such chill flows from the litigation, not from producing documents in response to this subpoena. It is unclear how producing records of AIF's grants to Media Matters, under a protective order, *see* Part IV.C, *infra*, would chill AIF's reporting on anyone. And AIF's own exhibits show that it continued to report on Musk and the Department of Government Efficiency well after this suit was filed. *See* Mot. at 6-7 & Exs. 19-25 (articles from November 2024 through April 2025). AIF's asserted reluctance to associate with Media Matters is likewise hard to square with its $1 million grant to Media Matters in 2024. Mot. at 6 & n.5.

***Communications Mentioning Musk, X, or Industry Topics.*** AIF warns that its staff "read and share news stories" about X, hold "personal opinions about Musk and X," and discuss misinformation, brand safety, and advertising as industry topics. Warner Decl. ¶¶ 20-22. Forwarding a news story or sharing a personal opinion with a colleague is not association "for the purpose of engaging in" protected expression, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), and the First Amendment recognizes no "generalized right of 'social association,'" *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). AIF makes no showing otherwise. Nor do *Moody* and *TikTok* make AIF's internal discussions privileged. *See* Mot. at 18. Those cases concerned laws that regulated a platform's editorial choices or effectively banned the platform altogether. *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024); *TikTok Inc. v. Garland*, 604 U.S. 56, 68-69 (2025) (per curiam). To state the obvious, a litigant's request for documents of a nonparty does not regulate what that nonparty publishes. If AIF believes that a particular responsive document reflects privileged association, it may withhold the document and "describe the nature of the withheld documents" so that the claim can be assessed. Fed. R. Civ. P. 45(e)(2)(A).

**B. X's need for the documents outweighs any interest AIF asserts.**

Even if AIF had made the required threshold First Amendment showing, X's need for the documents would outweigh the interests that AIF asserts, because the documents go to the heart of X's suit. X's claims turn on Media Matters' state of mind when it published the November 2023 articles, and the issuing court has held that donor-related documents, "particularly ones that are demonstrative of Defendants' mental state," go to "the heart of the matter." *X Corp.*, 2024 WL 4416887, at *9 (cleaned up). AIF's documents are no different.

Those AIF documents bear on Media Matters' state of mind because they record what Media Matters was telling its funders about its campaign against X. The subpoena asks for the communications behind AIF's $810,500 grant in 2023 and its $1 million grant in 2024. Request 5

seeks solicitations by Media Matters or its fundraiser relating to X, Musk, the articles, this litigation, or efforts to reduce advertising on the platform. ECF No. 1-2 at 170. Request 3 seeks any request or condition, including in "grant agreements, donation agreements, funding proposals, or similar instruments," that encouraged Media Matters to pursue advertiser boycotts or pressure campaigns. *Id.* And Request 4 seeks documents sufficient to show the trainings, videos, or webinars Media Matters and its fundraiser circulated about those subjects. *Id.*

Documents responsive to these requests could be crucial at trial. A solicitation that pitched Media Matters' work to pressure X's advertisers as a reason to fund it would be evidence that the articles served that campaign rather than an effort to report accurately. A grant condition or funder expectation tied to inducing X's advertisers to drop spending on X would be evidence of a motive to publish regardless of accuracy. And a pitch touting advertiser departures from X to secure AIF's larger 2024 grant would be evidence that Media Matters profited from the harm it caused. As the issuing court explained, X's punitive-damages claim "would not be better exemplified than through [Media Matters'] profiting off the alleged manipulation" of X's platform. *X Corp.*, 2024 WL 4416887, at *10.

That evidence goes to the elements that X must prove. Tortious interference requires a "willful and intentional act of interference." *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023). Business disparagement requires publication "with malice," *Vendever LLC v. Intermatic Mfg. Ltd.*, 2011 WL 4346324, at *4 (N.D. Tex. Sept. 16, 2011) (quoting *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)), which Texas law defines to include an intent to interfere with the plaintiff's economic interests, *see Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). Punitive damages require clear and convincing evidence of fraud, malice, or gross negligence, Tex. Civ. Prac. & Rem. Code § 41.003(a), and malice in that

context means "a specific intent by the defendant to cause substantial injury or harm to the claimant," *id.* § 41.001(7). And motive evidence is relevant to actual malice even if not alone sufficient. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667-68 (1989). Evidence that Media Matters told AIF its money would help drive advertisers off X would therefore be direct evidence of the intent X must prove.

AIF's own records matter for the same reason. AIF's declarant acknowledges that responsive materials "could include . . . internal American Independent Foundation communications discussing potential or actual donations, grants, and charitable solicitations." Warner Decl. ¶ 16. Because AIF's grants are awarded "at the discretion of the American Independent's leadership," *id.* ¶ 10, AIF's notes of calls with Media Matters or its fundraiser and its deliberations about funding Media Matters are a contemporaneous record of how Media Matters described its work on X to the people paying for it. That is not speculation. Another Media Matters funder served with a materially identical subpoena has produced, subject to the parties' stipulated protective order, Media Matters' grant application and the funder's own funding proposal, which explains its rationale for the grant and refers to the articles at issue. AIF's declarant denies only that AIF had editorial control over Media Matters or helped draft the articles, Warner Decl. ¶¶ 12-13, which X has never suggested; she does not deny that Media Matters solicited AIF's grants by reference to its work on X.

AIF does not dispute the relevance of Media Matters' own solicitations (Request 5) or the conditions attached to its grants (Request 3). It argues instead that its "internal correspondence" and its correspondence with "third parties such as the Bonner Group" are "irrelevant to Media Matters's knowledge or actions." Mot. at 26-27. Not so. AIF's internal records show what Media Matters told AIF and how AIF understood it. The Bonner Group is Media Matters' own fundraiser,

so its solicitations were made on Media Matters' behalf. *See* Factual Background § III, *supra*. And AIF's communications with other organizations about the campaigns against X's advertisers may show the coordinated effort that Media Matters admits it joined. *See* MMFA Interrog. Resps. at 170-71. AIF's cases held only that a *nonparty's* own bias was irrelevant, *see N.C. Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005); X seeks evidence of Media Matters' own statements and conduct.

The remaining requests seek evidence of the campaign itself: advertiser boycotts and pressure campaigns aimed at the platform, Media Matters' and its fundraiser's goals and strategies concerning them, initiatives aimed at X, such as the Stop Toxic Twitter and Stop the Deal coalitions, and documents concerning X, Musk, the articles, and misinformation, content moderation, brand safety, and advertising. ECF No. 1-2 at 166, 170 (Requests 1, 2, 6). Whether Media Matters published the articles to advance a multi-party, coordinated campaign to drive advertisers off the platform is the central question in the case. Evidence of that campaign bears on intent and malice, *see Herbert*, 441 U.S. at 160; *Mitchell*, 508 U.S. at 489, and on causation, because Media Matters will attribute advertiser departures to other causes, including other coalition members' activities.

* * *

Because AIF has not made the threshold showing, and because X's need for evidence at the heart of its claims would outweigh the interests AIF asserts in any event, the First Amendment provides no basis to quash the subpoena.

## III. The D.C. Shield Law Does Not Bar Enforcement of the Subpoena.

AIF's reliance on the District of Columbia's reporter's shield law fails for many of the same reasons. Mot. at 23-24. The statute protects "the source of any news or information procured by [a] person while employed by the news media and acting in an official news gathering

capacity," D.C. Code § 16-4702(1), and, subject to a qualified exception, other news or information procured in that capacity, *id.* §§ 16-4702(2), 16-4703(a). By its terms, then, the statute reaches only material obtained while "acting in an official news gathering capacity." *Id.* § 16-4702(1); *see Mannina*, 2026 WL 2186418, at *6.

As explained above, the subpoena does not seek such material. AIF "separately awards grants to other organizations," at "the discretion of the American Independent's leadership," and Media Matters is a publicly disclosed grantee. Warner Decl. ¶¶ 10-11; Mot. at 6. Media Matters' solicitations of those grants, the agreements and conditions governing them, and AIF's deliberations about them were not procured by a reporter acting in a newsgathering capacity. They are the records of a funder. AIF's attempt to paint the subpoena as targeting newsgathering or confidential sources is simply misleading.

Additionally, the party invoking the statute must show that it applies. In *Mannina*, the court rejected a shield-law claim because the proponents' evidentiary showing did not establish that the person at issue was a protected source. 2026 WL 2186418, at *6. AIF's declaration says only that responsive materials "could include" source communications. Warner Decl. ¶ 17. That is not a showing that any one document is protected. And it is certainly not a showing that the entirety of the subpoena should be quashed on this basis.

Because X does not seek AIF's sources or newsgathering materials, the Court need not reach the statute's qualified exception. *See* D.C. Code § 16-4703(a). If a particular responsive document would reveal a source or unpublished newsgathering material, AIF may redact or withhold and log it. Fed. R. Civ. P. 45(e)(2)(A); *see U.S. Commodity Futures Trading Comm'n v. Whitney*, 441 F. Supp. 2d 61, 68 (D.D.C. 2006) (ordering redaction of third-party information in reporter's-privilege dispute).

## IV. The Subpoena Satisfies Rules 45 and 26.

### A. The subpoena seeks relevant, proportional discovery.

Given that the subpoena satisfies the heightened showing the First Amendment balance requires, *see* Part II.B, *supra*, it necessarily satisfies Rule 26(b)(1). AIF's remaining relevance arguments fare no better. AIF contends that the subpoena is a "naked attempt to gather information for use in evaluating, and perhaps litigating, a claim against" AIF. Mot. at 24 (quoting *Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 18 (D.D.C. 2013)). But that is rank speculation; X asserts no claim against AIF, and the subpoena is tied to AIF's publicly disclosed funding of the defendant. AIF's other authorities involved discovery sought "for use in proceedings other than the pending suit," *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995 (D.C. Cir. 2014) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978)), or for "some future additional litigation," *Mehlhorn* Op. at 22. That is not the case here. X issued the subpoena in connection with its litigation against Media Matters and intends to use the documents produced there. Nor does *US Dominion Inc. v. My Pillow Inc.*, 2024 WL 2880425, at *5-6 (D.D.C. June 7, 2024), help AIF. As AIF describes it, that case involved nonparty information on which the defendant had not relied, Mot. at 25, whereas X seeks what Media Matters itself told its funder.

The remaining Rule 26(b)(1) factors point the same way. The issues at stake, whether a media organization knowingly published false reports to drive advertisers from a platform, are important, and the amount in controversy is substantial. *See* Mot. at 4 (noting X's demand for more than $100 million in damages). AIF alone has access to its internal records, while X has none. And the six requests are tied to a single, publicly disclosed funding relationship and limited to a defined period. ECF No. 1-2 at 168-70. Ultimately, AIF's argument reduces to the proposition that because X has sought donor-related discovery from Media Matters, it may not seek related discovery from Media Matters' funders. The law imposes no such restriction.

**B. The information sought is not available from a more convenient source.**

AIF argues that X must obtain the information it seeks from Media Matters instead. Mot. at 27-29. But X has asked Media Matters for this information and Media Matters has declined to produce most of this discovery. MMFA Interrog. Resps. at 146-47. Much of what X seeks, moreover, likely never reached Media Matters at all. AIF's internal deliberations about funding Media Matters, and any notes it kept of calls with Media Matters or its fundraiser, would be in AIF's files, not Media Matters'. *See* Warner Decl. ¶¶ 10, 16; Part II.B, *supra*. And solicitations that The Bonner Group sent to AIF on Media Matters' behalf may not have been copied to Media Matters. Even where documents overlap, nonparty files may contain "different versions of documents, additional material, or . . . significant omissions." *In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 504 (D.N.J. 2021).

AIF's exhaustion argument also misstates the governing standard. AIF insists that X must have "exhausted every reasonable alternative source of information." Mot. at 16 (quoting *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3-4 (D.D.C. 2002)). But *Mehlhorn*, which AIF itself invokes on this point, Mot. at 28, asks only whether the requesting party "can or has attempted to obtain the information elsewhere," *Mehlhorn* Op. at 17, and it ordered nonparties to produce documents concerning the defendant's conduct because, to the extent that they held information the defendant did not, "they would be the best sources for that information," *id.* at 29-30. And even under AIF's cases, X has made the "reasonable attempts" required through more than two years of party discovery from Media Matters on this very category of material. *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002). AIF cites no authority holding that a party must wait out an appellate stay of its opponent's production before seeking a nonparty's own records. *See* Mot. at 28.

AIF also points to the volume of Media Matters' production, which now exceeds 540,000 pages. Mot. at 28-29. But that volume says nothing about whether Media Matters has produced the documents at issue here. Broadly, donor-related production is the very discovery the Fifth Circuit stayed, and AIF's internal records were never in Media Matters' files. AIF's authority quashed a subpoena for deposition testimony that duplicated what the requesting party already had. *See* Mot. at 29 (citing *In re Subpoena to Goldberg*, 693 F. Supp. 2d 81, 87 (D.D.C. 2010)). That is not the case here. Finally, for the reasons given in Part V, *infra*, the Fifth Circuit's stay of Media Matters' production obligations does not make the subpoena an improper end-run. *See* Mot. at 28.

**C. The subpoena does not impose an undue burden.**

AIF also fails to show that compliance would subject it to undue burden. Fed. R. Civ. P. 45(d)(3)(A)(iv). Whether a burden is undue turns on a fact-specific balancing of the interests served by demanding compliance against those served by quashing, *Dell Inc. v. DeCosta*, 233 F. Supp. 3d 1, 3 (D.D.C. 2017), and asks whether the subpoena is unreasonable or oppressive in light of all the circumstances, *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984). "Vague and conclusory assertions are not sufficient; rather, a showing of undue burden 'must be specific' and concrete." *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 2019 WL 5864595, at *2 (D.D.C. Nov. 8, 2019) (quoting *Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000)). "Assertions of an undue burden without 'specific estimates of staff hours needed to comply' should be 'categorically rejected.'" *Id.* (quoting *Ass'n of Am. Physicians & Surgeons v. Clinton*, 837 F. Supp. 454, 458 n.2 (D.D.C. 1993)). AIF's burden argument begins with its First Amendment and shield-law objections, Mot. at 29-30, which fail for the reasons given in Parts II and III. The rest of its showing is not specific.

AIF's declarant states that compliance "would be expensive," that it would require AIF "to retain outside counsel to collect, review, and produce documents" because AIF has no in-house counsel, and that it would burden staff who expect to be busy covering the fall elections. Warner Decl. ¶¶ 25, 27. She offers no estimate of the number of documents, custodians, hours, or cost. The figures in AIF's brief, that potentially responsive documents would run "well into the thousands or tens of thousands" and that review would take "hundreds of hours," Mot. at 30-31, appear nowhere in the paragraph of the declaration the brief cites. *Compare id.* (citing Warner Decl. ¶ 25), *with* Warner Decl. ¶ 25. Counsel's argument is not evidence, and even a sworn estimate of "hundreds of hours" would not suffice without more. *See Fairholme Funds*, 2019 WL 5864595, at *3 (rejecting such an estimate: "Will it be 100? Will it be 900? How many attorneys will be required?"). AIF's remaining concern, that it could lose donors "because of the subpoena," Warner Decl. ¶ 26, assumes that the subpoena seeks the identities of AIF's donors. It does not. *See* Part II.A, *supra*. And the election-season workload AIF describes, Warner Decl. ¶ 27, is temporary.

AIF's overbreadth arguments rest on a false premise. AIF contends that the subpoena's requests "impose no temporal limitation or date range at all," and that "[t]he absence of a date range alone" renders the subpoena overbroad. Mot. at 30 (citing *Benham v. Rice*, 238 F.R.D. 15, 19-27 (D.D.C. 2006), and *Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 174 n.9 (D.D.C. 1998)). Had AIF met and conferred, X could have pointed it to paragraph ten of the instructions, which limits every request to the period from April 14, 2022, through November 1, 2024. ECF No. 1-2 at 167-69. AIF's authorities, which faulted requests without time limits, do not apply. AIF's other authorities found undue burden where a nonparty would have had to review thousands of documents or devote a large share of its staff to compliance for weeks, Mot. at 31, and AIF's evidence shows neither. In *Mehlhorn*, moreover, the requesting party did not respond to the

nonparties' burden arguments at all. *Mehlhorn* Op. at 32-33. And to the extent AIF must take care with privileged or personal information, Mot. at 31, the subpoena already provides for redaction and a privilege log process, ECF No. 1-2 at 168-69, and sensitive material can be designated confidential or attorneys' eyes only.

AIF contends that no confidentiality protection could suffice because disclosure would be made "directly to Musk's X Corp.," and because the issuing court did not enter the parties' stipulated protective order. Mot. at 22. True, the issuing court did not enter the order. But the parties have conducted discovery under the stipulation, which provides confidential and attorneys' eyes only designations, and more than a dozen nonparties have produced documents under it, with their designations honored by both parties. X will treat AIF's production as subject to the stipulation and is bound by that representation in this Court. Material designated attorneys' eyes only goes to outside counsel, not to X's personnel.

*Nor do Bonta* and *First Choice* support AIF's contention that a protective order cannot address its First Amendment concerns. Both involved demands by a state attorney general, and the concern that confidentiality cannot dispel the chill rested on the pressure that arises when government officials hold the information. *See Bonta*, 594 U.S. at 618 ("[E]ach *governmental* demand for disclosure brings with it an additional risk of chill." (emphasis added)). That concern has little force when a private litigant's outside counsel receives documents under a protective order for use in a pending case, and courts applying the privilege in civil discovery have relied on confidentiality orders for that reason. *See Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1462-63 (9th Cir. 1991); *Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 240-41, 243 (D. Me. 2010); *Klayman v. Judicial Watch, Inc.*, 2008 WL 11394177, at *4 (D.D.C. Jan. 8, 2008), *aff'd*, 2008 WL 11394172 (D.D.C. Apr. 2, 2008); *Bright Response, LLC v. Google Inc.*,

2009 WL 10741629, at *2 (E.D. Tex. Sept. 29, 2009). And *First Choice* addressed Article III standing, not the weight of a protective order in a discovery balance. *See First Choice*, 608 U.S. at 183.

Finally, AIF's motion leans on the broadest terms in Request 1, such as "advertising" and "misinformation," to condemn all six requests as unduly burdensome. Mot. at 26, 30. But AIF does not explain how those terms bear on Requests 2 through 6, which are framed around Media Matters, its fundraiser, and the campaigns aimed at X and its advertisers. ECF No. 1-2 at 170. And even assuming a particular term reached further than the case requires, the answer would be to modify the subpoena, not to quash it. Rule 45 authorizes a court to "quash or modify" a subpoena that imposes an undue burden, Fed. R. Civ. P. 45(d)(3)(A), and a movant's burden is "particularly heavy" when it seeks to quash rather than obtain "some more limited protection," *Westinghouse*, 351 F.2d at 766 (internal quotation marks omitted). AIF's other complaints about scope are the sort the meet-and-confer process exists to resolve. AIF says, for example, that Request 6 "appears to be a blatant attempt" to uncover information about X's "perceived enemies," Mot. at 27, but the subpoena defines that request's key term by reference to initiatives aimed at X, and the two examples it gives are coalitions in which Media Matters itself participated, ECF No. 1-2 at 166. If AIF was unsure what a request reached, the solution was to ask. X asked AIF to identify its objections before discussing any changes to the subpoena; AIF instead moved to quash four days before its response deadline.

## V. The Court Should Decline to Stay the Subpoena.

AIF asks this Court, in the alternative, to issue a protective order that stays enforcement of the subpoena pending a final decision on Media Matters' appeal in the Fifth Circuit. That request should be denied for two reasons. First, the pending appeal concerns whether Media Matters itself waived its privilege and whether party requests aimed at Media Matters' entire donor list were

proportionate, questions specific to Media Matters' conduct, not AIF's independent obligations as a nonparty. Second, if AIF's real concern is avoiding inconsistent rulings on overlapping issues, X's separate motion to transfer under Rule 45(f) offers a cleaner path. Indefinite delay in this Court only prejudices X's need for discovery already withheld for two years.

Nor does the Fifth Circuit's stay order make the subpoena an improper end-run around party discovery. *See* Mot. at 28. That order is a preliminary ruling, issued under the likelihood-of-success standard that governs stays pending appeal, not a final adjudication of the merits. It was entered by a different circuit, and it stayed four specific requests directed to Media Matters, including a request for the identities of all of Media Matters' donors. *X Corp.*, 120 F.4th at 194, 199. It does not bind this Court or AIF, and it acknowledged that donor communications "could otherwise be relevant to X Corp.'s theories." *Id.*

AIF's authorities do not support a stay. Mot. at 33 (citing *In re Subpoena to Wang*, 214 F. Supp. 3d 91, 95-96 (D.D.C. 2016); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Stone v. Trump*, 356 F. Supp. 3d 505, 518 (D. Md. 2018)). *Wang* presented only the narrow question of *when* a third-party deposition should proceed. 214 F. Supp. 3d at 95. The parties there agreed that the deposition was proper; their disagreement was whether it "should be delayed until after the discovery dispute ha[d] been resolved" in the issuing court concerning ongoing attorney-client privilege objections. *Id.* While that dispute resulted in the "drafting [of] a joint discovery letter brief" the brief "ha[d] yet to be filed with the [issuing] court." *Id.* at 94. Here, by contrast, AIF contests the validity of the entire subpoena, not merely the timing of production, and the issuing court granted X's motion to compel, which has been stayed pending an appeal now approaching two years old.

As for *Landis*, the general rule for which AIF cites it, "recognizing courts' inherent power to stay cases to manage their docket," Mot. at 33, is correct but too broad to help here. X does not dispute the Court's inherent power to manage its docket; X maintains that the sound exercise of that power, and the wise use of judicial resources, is to deny the motion. *Stone* fares no better. AIF relies on it for the general proposition that a stay can "further conserve judicial, party, and nonparty resources," *id.*, but offers no explanation for why that would be true here. Because the pending appeal concerns matters separate from the subpoena and AIF's independent obligations as a nonparty, a stay would not produce the savings *Stone* anticipated. And AIF's assertion that a stay would not prejudice X because X has agreed to await the Fifth Circuit's decision before trial, *id.*, ignores that discovery closes on February 5, 2027. Delay would deprive X of AIF's documents before it deposes Media Matters' witnesses and prepares for pretrial motion practice.

**CONCLUSION**

For the reasons above, X respectfully requests that the Court deny AIF's Motion to Quash X Corp.'s Nonparty Subpoena or for a Protective Order in its entirety.

Dated: October 12, 2026

Respectfully submitted.

*<u>/s/ Kelly E. Lynch</u>*
Kelly E. Lynch (D.C. Bar No. 1032362)
**MAYNARD NEXSEN, P.C.**
1155 F Street NW, Suite 550
Washington, DC 20004
Telephone: (202) 868-5927
klynch@maynardnexsen.com

Christopher D. Hilton (*pro hac vice* pending)
Texas Bar No. 24087727
Linda Leibfarth (*pro hac vice* pending)
Texas Bar No. 24083380
**STONE HILTON PLLC**
600 Congress Ave., Ste. 2000
Austin, TX 78701
Telephone: (737) 256-6025
chris@stonehilton.com
linda@stonehilton.com

***Counsel for X Corp.***

**CERTIFICATE OF SERVICE**

I hereby certify that this document was served on all counsel of record via the Court's CM/ECF system on October 12, 2026.

/s/ Kelly E. Lynch
Kelly E. Lynch